[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

Nos. 13-10839; 13-12901; 13-14302
_____

D.C. Docket Nos. 3:09-cv-10000-TJC-JBT,

3:09-cv-10000-WGY-JBT


In Re: ENGLE CASES
_____

4432 INDIVIDUAL TOBACCO PLAINTIFFS,

Plaintiff - Appellant,

versus

VARIOUS TOBACCO COMPANIES,
LIGGETT GROUP, LLC,
VECTOR GROUP, LTD.,

Defendants - Appellees.

_____

Appeals from the United States District Court
for the Middle District of Florida
_____

(September 10, 2014)

Before ED CARNES, Chief Judge, TJOFLAT and SILER,[*] Circuit Judges.

TJOFLAT, Circuit Judge:

These consolidated appeals are yet another chapter in the ongoing tobacco litigation that began as a class action in Florida courts more than two decades ago and has since swollen the federal docket with thousands of individual cases. Today we are asked to decide the fate of 588 personal injury cases filed on behalf of purportedly living cigarette smokers who, as it turns out, were dead at the time of filing (a group we shall call the "predeceased plaintiffs"), 160 loss of consortium cases filed on behalf of spouses and children[1] of these predeceased plaintiffs, and two wrongful death cases filed more than two years after the decedent-smoker's death. These cases all suffered from various patent defects. As any lawyer worth his salt knows, a dead person cannot maintain a personal injury claim; under Florida law, a loss of consortium claim is "derivative in nature and wholly dependent on [the injured party's] ability to recover," Faulkner v. Allstate Ins. Co., 367 So. 2d 214, 217 (Fla. 1979);[2] and claims brought pursuant to the

_____

[*] Hon. Eugene E. Siler, Jr., United States Circuit Judge for the Sixth Circuit, sitting by designation.

[1] In addition to spouses, Florida law authorizes a loss of consortium claim by dependent, unmarried children. See Fla. Stat. § 768.0415. For ease of discussion, we will refer to consortium claimants as the smokers' spouses throughout this opinion, since that is most often the case.

[2] Where an injured party dies as a result of his or her injuries, the Florida Wrongful Death Act provides for recovery of the survivors' consortium damages through a wrongful death claim

2

Florida Wrongful Death Act are subject to a two-year limitations period, Fla. Stat.

§ 95.11(4)(d).  Plaintiffs' counsel sought leave from the District Court to amend

the complaints in these cases to fix these defects.  For reasons we will discuss in

detail, the District Court denied those requests and accordingly dismissed these

cases.[3]

Despite the thousands of pages of briefing to the District Court and to this

court, the root of the problem in all these cases is simple.  Back in 2008, when

these cases were originally filed, the law firm that brought them didn't have the

time or resources required to fully investigate all the complaints (the firm in

question filed claims on behalf of over 4,000 individuals).  As a result, problem

after problem cropped up once the District Court started going through the

inventory of cases:  there were personal injury claims filed on behalf of deceased

smokers, wrongful death claims filed by "survivors" of smokers who were still

living, cases filed as a result of "clerical errors," multiple cases filed for the same

---

filed by the personal representative of the decedent's estate.  See Fla. Stat. § 768.21; Capone v. Philip Morris USA, Inc., 116 So. 3d 363, 375–76 (Fla. 2013).

[3] The District Court's dismissals were pursuant to the defendants' joint motions to dismiss.  We review three orders in these appeals: (1) Order dated January 22, 2013, dismissing 521 personal injury cases brought on behalf of predeceased smokers and 132 loss of consortium cases brought on behalf of family members of these predeceased plaintiffs, Doc. 925; (2) Order dated June 17, 2013, dismissing 67 more personal injury cases brought on behalf of predeceased plaintiffs, 3 derivative consortium cases, and 2 wrongful death cases filed after expiration of the limitations period, Doc. 1101; and (3) Memorandum and Order dated August 16, 2013, dismissing 37 more loss of consortium cases associated with predeceased plaintiffs' personal injury cases—only 25 of which were contested, Doc. 1130.

person, cases filed for people the law firm had no contact with, claims that had already been adjudicated by another court, cases filed for people who didn't want to pursue a lawsuit, and claims filed long after the relevant limitations period had run. Over and over, plaintiffs' counsel explained that these problems were the result of the unique logistical difficulties involved in managing so many individual lawsuits. And over and over the District Court reminded counsel that a lawyer's responsibilities to the court are not diluted even by an ocean of claims.

The defects that led to today's consolidated appeals all stem from counsel's failure to obtain accurate information regarding whether or when certain smokers died. The problems came to light in early 2012—four years after the cases were filed—after the court ordered that each plaintiff submit answers to a basic questionnaire that asked, among other things, if the smoker whose injuries or death formed the basis for the lawsuit was alive and, if not, when he or she died. Once the completed questionnaires revealed that hundreds of claims were invalid as filed, plaintiffs' counsel sought leave to amend their defective pleadings to add legal claims and factual allegations that should have appeared in the original complaints and, in some cases, to substitute in a new party who should have been the named plaintiff from the beginning.[4] The District Court denied counsel's

---

[4] We say "counsel" sought leave to amend "their" complaints and substitute in new parties—rather than referring to the new parties themselves—because the lawyers in these cases have established a pattern of acting on behalf of "clients" they have dubious authority to

requests because, among other reasons, these problems could have been avoided if counsel had properly investigated the claims, and even if that lack of diligence were somehow excusable, counsel failed to inform the court that so many complaints were defective.  Having denied counsel's motions for leave to amend and substitute parties, the court dismissed these facially invalid complaints.

After hearing oral argument and considering the parties' briefs in each of these consolidated appeals, we find the District Court to have acted within its discretion when it denied plaintiffs' counsel's motions to amend and substitute. Accordingly, we affirm the court's dismissals of all these cases.

In part I of this opinion, we briefly describe the state-court proceedings and the facts leading up to the filing of these cases.  In part II, we march through the lengthy proceedings in the District Court and describe the District Court orders dismissing each category of cases.  In parts III through V we give our reasons for affirming the District Court's dismissal of each category.  And we conclude in part VI.

I.

Twenty years ago, a small group of plaintiffs sued the major United States tobacco companies in the Circuit Court of Dade County, Florida, seeking damages

represent.  As will become evident from the history of this mass action, plaintiffs' counsel have mostly managed their inventory of cases as they see fit, with scant contact with or input from the individuals they purport to represent.

for injuries allegedly caused by smoking cigarettes.  A class was eventually certified to include "all Florida citizens and residents" "and their survivors, who have suffered, presently suffer or who have died from diseases and medical conditions caused by their addiction to cigarettes that contain nicotine."  See R.J. Reynolds Tobacco Co. v. Engle ("Engle I"), 672 So. 2d 39, 40, 42 (Fla. 3d Dist. Ct. App. 1996) (alteration and quotation marks omitted).  To manage the litigation, the trial court crafted a three-phase plan.  In Phase I the jury decided certain foundational facts—for example, "that smoking causes some, but not all, of the diseases in issue," "that cigarettes containing nicotine are addictive," and "that the defendants had engaged in unspecified conduct that rose to a level that would permit a potential award or entitlement to punitive damages."  Liggett Grp. v. Engle ("Engle II"), 853 So. 2d 434, 443 (Fla. 3d Dist. Ct. App. 2003) (quotation marks omitted).  In Phase II, the same jury decided that the tobacco defendants were liable for the class representatives' injuries and awarded compensatory damages totaling $12.7 million.  Engle v. Liggett Grp. ("Engle III"), 945 So. 2d 1246, 1257 (Fla. 2006).  The jury also awarded $145 billion in punitive damages for the entire class during Phase II.  Id.  According to the plan, in Phase III new juries would separately decide liability and compensatory damages for each of the estimated 700,000 class members, and the class-wide punitive award would be divvied up among the successful class members.  Id. at 1258.

6

Phase III never happened.  After Phases I and II, the tobacco defendants appealed.  For reasons not relevant today, the Florida District Court of Appeal, Third District, decertified the class and reversed the class-wide punitive damages award.  Engle II, 853 So. 2d at 450, 456.  The Florida Supreme Court granted certiorari review and held that class certification was appropriate for Phases I and II, but not for Phase III, in which "individualized issues such as legal causation, comparative fault, and damages predominate."  Engle III, 945 So. 2d at 1268.  Because (most of) the jury's Phase I findings pertained to issues common to all class members, the Supreme Court decertified the class but held that "[c]lass members can choose to initiate individual damages actions and the Phase I common core findings . . . will have res judicata effect in those trials."  Id. at 1269.  The Florida Supreme Court gave class members one year from the date its mandate issued to file their individual lawsuits—a period that ended on January 11, 2008.

The cases before us today are "Engle progeny cases."  They were filed within Engle III's one-year savings period by lawyers at The Wilner Firm of Jacksonville, Florida.  Back in 1996—when the Engle class action was just winding up—Mr. Norwood Wilner tried one of the first successful smoker cases against a tobacco company.  Naturally, Mr. Wilner's firm was inundated with potential clients.  Throughout the mid-1990s, thousands of people contacted the firm to express interest in suing tobacco companies.  According to Mr. Wilner, his

7

law firm undertook the representation of some 3,000 living smokers and surviving family members of deceased smokers.  Mr. Wilner figured that most of these clients were Engle class members, and so he just collected names and waited for the class action to run its course.

As we now know, in the years it took Engle to wind its way through state court, Mr. Wilner lost contact with many of his clients.  When the Florida Supreme Court decided Engle III in 2006, he attempted to track them down, but he had trouble locating all of them.  As the one-year period came to a close, he was still unable to contact some (undisclosed) portion.  Nevertheless, he decided to file suit on behalf of all his "clients," whether he was able to reestablish contact or not.

Thus, in January 2008, The Wilner Firm filed 17 multi-plaintiff complaints in the Circuit Court for Duval County, Florida.  Each complaint alphabetically listed approximately 220 plaintiffs; some complaints alleged wrongful death claims for all 220 plaintiffs, others alleged personal injury claims for all the plaintiffs.  Both types parroted the original Engle complaints, presenting counts for strict liability, breach of warranty, fraudulent concealment of the health effects of smoking, civil conspiracy to do the same, negligence, and loss of consortium.  The allegations were highly generalized.  For example, the personal injury complaints alleged that the named plaintiffs "suffer[ed] from a tobacco related illness" or were "married to a smoking plaintiff who suffered from a tobacco related illness," but

8

did not provide more details of the smokers' injuries or even designate which of the 220 named plaintiffs were "smoking Plaintiffs" and which were "consortium Plaintiffs." See, e.g., Bradshaw v. R.J. Reynolds Tobacco Co., no. 3:08-cv-149, Doc. 2, ¶¶ 1.3–1.4 (M.D. Fla. Feb. 12, 2008). Similarly, the wrongful death complaints alleged that the plaintiffs' decedents "died of their tobacco related illnesses" and the survivors and estates "suffered damage and injury including medical and funeral expenses, loss of support and services, mental pain and suffering, interest and expenses," but did not give any plaintiff-specific information or even a date of death for the deceased smokers. See, e.g., id., ¶¶ 1.3, 11.1 (Feb. 12, 2008). Mr. Wilner filed 27 similarly organized multi-plaintiff complaints in the United States District Court for the Middle District of Florida, encompassing the claims of 660 total plaintiffs. Apparently acting in an abundance of caution, Mr. Wilner also filed duplicate state-court actions for each of these 660 individuals.

Mr. Wilner chose to list his "nonresponsive clients" as plaintiffs in the personal injury complaints. That decision, coupled with his failure to include dates of death in the wrongful death complaints, sowed the seeds for the present appeals.

II.

9

A.

Shortly after Mr. Wilner's en masse filing, the tobacco defendants removed the 17 state-court cases to the Middle District of Florida, relying on the Class Action Fairness Act of 2005 ("CAFA"), Pub. L. No. 109-2, 119 Stat. 4.  After removal, the District Court had before it 44 multi-plaintiff cases, which included the claims of 4,432 named plaintiffs.  The plaintiffs in each case promptly moved the District Court to remand their case.  The defendants opposed their motions and, at the same time, moved the court pursuant to Rule 16(c) of the Federal Rules of Civil Procedure to determine the preclusive effect, if any, the Engle Phase I jury findings would have on the litigation of the plaintiffs' claims.[5]

The District Court ruled on the respective motions in two of the 44 cases.  In an order dated August 28, 2008, the court held that the Phase I findings could not be used to establish any element of the plaintiffs' claims, but it "reserve[d] judgment on whether the findings may have any other preclusive effect."  Brown v. R.J. Reynolds Tobacco Co., 576 F. Supp. 2d 1328, 1348 (M.D. Fla. 2008).  And in an order dated August 29, 2008, the court denied the plaintiffs' motion to remand. See Cooper v. R.J. Reynolds Tobacco Co., 586 F. Supp. 2d 1312, 1323 (M.D. Fla. 2008).  Following these two orders, the District Court entered an order in each of

---

[5] Under Rule 16(c)(2), the court may decide important legal issues in the early stages of a lawsuit as a way to simplify the proceedings.

the 44 cases deferring its ruling on any motions pending in those cases until the parties had an opportunity to seek appellate review of its August 28 and 29 orders.

Both sides requested that the District Court certify its August 28 order for interlocutory appeal pursuant to 28 U.S.C. § 1292(b), and the court granted the certification. The plaintiffs sought leave in this court to appeal the August 29 order pursuant to 28 U.S.C. § 1453(c).[6] While the parties were awaiting this court's decision on whether to review the August 28 and 29 orders, they jointly requested the District Court to stay further proceedings in all 44 cases until this court decided whether to review either of the two orders and, if it granted review, until it rendered a decision. On October 29, 2008, the District Court granted the joint motion and entered an order staying further proceedings in the cases.

This court denied plaintiffs leave to appeal the August 29 order, but granted the parties leave to appeal the August 28 order. The details of that appeal, which this court decided in 2010, are not relevant to today's cases. See Brown v. R.J. Reynolds Tobacco Co., 611 F.3d 1324 (11th Cir. 2010) (vacating the District Court's August 28 order and remanding for further proceedings to determine (a) the scope of factual issues decided by the Phase I jury and (b) which elements of the Engle progeny claims, if any, are established by those facts).

---

[6] 28 U.S.C. § 1453(c) provides that "a court of appeals may accept an appeal from an order of a district court granting or denying a motion to remand a class action to the State court from which it was removed if application is made to the court of appeals not more than 10 days after entry of the order."

While the plaintiffs' appeal from the August 28 order was pending, the District Court created an individual case for each of the 4,432 plaintiffs.[7] The 4,432 cases were given separate docket numbers. The docket entries indicated that the case had only one plaintiff—all of the tobacco companies remained named as defendants in each case. The court did not require plaintiffs' counsel to file a new complaint in each of those cases at that time.

The District Court also created a master docket to deal with case-management issues and other matters common to all of the cases. The court had been working with the parties from the start to come up with a plan for managing the 4,432 cases. As a short-term solution to at least stem the tide, the parties suggested that the court keep the stay order in place indefinitely in most of the cases, only "activating" a small batch at a time. The idea was to proceed with a handful of representative cases instead of marching forward with all 4,432 at the same time—thus giving the parties and the court the opportunity hammer out many of the contested issues that would crop up in all of the cases. The court agreed and thus left the stay order in place in all but a dozen cases of the parties' joint choosing.

But the court wasn't satisfied with chipping away at the mountain a handful at a time; it sought additional ways to shorten the otherwise hundred-year task of

---

[7] After this court declined to review the District Court's order denying plaintiffs' motions to remand, it became clear that the court would eventually have to try all 4,432 cases.

trying the cases even in batches.  Mr. Wilner helped by asking the court to dismiss 499 cases without prejudice pursuant to Rule 41(a)(2) of the Federal Rules of Civil Procedure.  These 499 cases were part of the 660 The Wilner Firm originally filed in both federal and state court (the "dual-filed cases"); Mr. Wilner decided that the firm would rather litigate the cases in state court, and the District Court gladly accommodated his request.  During a status conference held in December 2010, Mr. Wilner also indicated that some portion of the firm's cases was likely no longer viable because the plaintiffs had died without leaving any heirs.  During the same hearing, defense counsel informed the court that other cases were due to be dismissed because the plaintiffs had already tried their claims against the tobacco companies.

The District Court tried to get a handle on how many non-viable cases were sitting on its docket, but neither side could give it an informed estimate during the hearing.  Therefore, in an omnibus order issued following the hearing, the court instructed the parties "to carefully and individually review each of the roughly 3800 remaining cases to determine which of those cases [was] presently due to be dismissed (whether because a case has already been tried in state court, because a plaintiff has died leaving no heirs, or otherwise)" and which cases should be consolidated to pair loss of consortium cases with their associated personal injury

13

case.[8]  Doc. 42, at 7–8.[9] Upon completing this review, the parties were ordered to file "a certification that the party has reviewed each individual case."  Id. at 8.

The District Court also ordered the parties to "redouble their efforts" to identify procedures to streamline the litigation and cut down the number of cases that would ultimately need to be tried.  Among their docket-management suggestions, the defendants requested that The Wilner Firm provide the following information, based on client interviews, to help weed out non-viable cases:

> 1.  Whether the named Plaintiff is alive (and, Defendants would request, still wishes to pursue the action).
>
> 2.  Whether, if the named Plaintiff has died, there is an heir with proper legal authority (and desire) to pursue the lawsuit.
>
> 3.  Whether there is a viable consortium claim that must be paired with the original action.

Doc. 48, at 2.  Mr. Wilner balked at the suggestion that his law firm contact its clients to gather this information—citing the time and resources required and the likelihood that the information would quickly become outdated as more plaintiffs died over time.  Thus, he stated the firm's intention to comply with the court's order by just reviewing the information the firm already had in its files.  See Doc.

---

[8] Because of the way the complaints were drafted—without distinguishing the primary personal injury plaintiffs (the smokers) from the consortium plaintiffs (the smokers' spouses)—when the court ordered the claims of the 4,432 named plaintiffs presented in separate cases, there was no way to know which cases belonged together.

[9] Unless otherwise indicated, record citations refer to documents filed in the Engle master docket, M.D. Fla no. 3:09-cv-10000.

61, at 3 ("[W]e have individual files for each plaintiff we represent, and we will make a good faith effort to screen each case for information contained within the file that suggests the case is not a viable one for reasons such as those described in the Court's order.").

Not long thereafter, Mr. Wilner filed the certification required by the omnibus order. Having "reviewed each individual case in counsel's files," he sought to voluntarily dismiss 136 more of the dual-filed cases under Rule 41(a)(2) of the Federal Rules of Civil Procedure (so his firm could litigate these individuals' claims in state court); he sought leave to withdraw as counsel in 332 cases that "involve for the most part clients who have not been in contact with the undersigned or have claims that the undersigned cannot prosecute"; he sought to "administratively close" 118 docketed cases that were the result of a "clerical error on behalf of plaintiff[s'] counsel," and he sought to consolidate around 500 consortium cases with their associated smokers' cases.[10]  See Doc. 114, at 1–3.

The tobacco defendants filed their own list of cases to be dismissed for different reasons. They identified 25 cases in which the plaintiff had previously opted out of the Engle class; 30 claims that had already been resolved by another court (and at least one that Mr. Wilner himself had tried to verdict); 125 cases that

---

[10] Plaintiffs' counsel did not identify any plaintiffs who had died without leaving any heirs—the very problem that prompted the court to order a "careful[] and individual[] review" of the cases remaining on the docket.

15

were duplicates of another federal case; and 250 that had duplicates pending in state court.  See Doc. 113.  Relying on the fact that The Wilner Firm had culled hundreds of cases based only on a review of its files—including 332 plaintiffs with whom the firm had lost contact—the defendants asked the court to order The Wilner Firm to send questionnaires (at the defendants' expense) to the firm's clients to assess the viability of the remaining 2,700 or so cases.  Doc. 128, at 4–5.

Given clear indication from both sides that the docket was bloated with hundreds of non-viable cases—and that The Wilner Firm wanted to withdraw from over 300 cases and simply leave them sitting on the court's docket—the District Court dismissed the cases the parties agreed should not proceed, ordered the parties to prepare a consolidated list of additional cases to be dismissed, and suspended all other filings in the master docket until it had a chance to address in another hearing the inflated docket and The Wilner Firm's motion to withdraw as counsel in 332 of the cases.  The first round of cuts resulted in more than 700 cases being dismissed and around 500 being consolidated—bringing the number of cases down to around 2,700.

During this same time period, the District Court appointed a Temporary Special Master to work with the parties to hasten the ultimate disposal of all the Engle cases.  With the parties' input, the Special Master came up with several case-management recommendations.  His first short-term goal was to identify and

16

categorize triable cases. To accomplish that, the court needed more information about the cases still pending: "successful case management, aggregation, or consolidation of these cases depends on more knowledge of the number, location, and characteristics of the individual cases and the isolation and dismissal of those that are not legally viable." Doc. 147, at 14. Based on his discussions with the parties, the Special Master believed that "neither side has any real grasp of the composition of the universe of cases"; "[c]ounsel know next to nothing about more than 90% of this action," though "[t]he parties agree that a number of the inactive cases are not viable for one or more reasons . . . ." Id. at 38. To fill this information gap, the Special Master recommended that he send questionnaires to each plaintiff to gather basic information about the plaintiff's case.[11]

Plaintiffs' counsel—which now included attorneys from the firm Lieff Cabraser Heimann & Bernstein, LLP, of San Francisco—objected to the Special Master's proposed questionnaire and his belief that they knew "next to nothing" about their cases. They assured the District Court that questionnaires weren't needed "because counsel already possess the vast majority of this data, and are

---

[11] The Special Master proposed an 11-question form that asked, for example, whether the smoker was alive; if deceased, whether the smoker had a legally-authorized representative; whether the party had opted out of the Engle class action; whether the party had previously brought other lawsuits against the tobacco defendants; and whether the party was willing to continue pursuing the lawsuit filed by The Wilner Firm. See Doc. 147, at 24–25.

17

working diligently to fill in all gaps."[12]  Doc. 158, at 15.  They explained that there

was "ongoing and routine communications by telephone, mail, in person meetings,

and electronic communications, between plaintiffs' counsel and the plaintiffs."  Id.

at 14.  And they assured the court that the information the Special Master sought

"will not result in a substantial reduction in the number of cases"; "[s]uch

winnowing has already occurred," and so "there is no longer any sizeable group of

cases ripe for dismissal."  Id. at 14–15 (quotation marks omitted).

In a hearing conducted in June 2011, the District Court sought an

explanation for all the non-viable cases that The Wilner Firm and the defendants

had already identified, and it sought the parties' input on how to go about

identifying the non-viable cases that almost certainly remained on the docket.  The

court was concerned that Mr. Wilner had simply filed cases based on a list of

smokers compiled in the 1990s, without making any effort to investigate the basic

facts underlying the claims or ensure that his firm's "clients" were willing and able

to prosecute a lawsuit in 2008.  Mr. Wilner explained that he had filed suit on

behalf of "some" people whom he had been "historically in contact with"—that is,

not in contact with during the Engle III savings period—but he assured the court

---

[12] In an attempt to satiate the court, plaintiffs' counsel came forward with some of their data, but the information they provided was incomplete and lacked the level of granularity that would have made it useful.  For example, plaintiffs' counsel claimed to have dates of death of 1,393 smokers, but they only provided summary data in five-year blocks (i.e., how many smokers died between 1990 and 1995, between 1995 and 2000, and so on) and they didn't reveal that many of these deceased smokers were currently listed as personal injury plaintiffs.

18

that "[m]ost of them we were in contact [with] shortly after" he filed suit on their behalf.  Doc. 171, at 7.  The 332 cases in which he was seeking to withdraw as counsel were the only cases involving individuals with whom he hadn't been able to reestablish contact.

Still concerned, the court asked Mr. Wilner, point blank, "are you telling us that you have—that you are in direct contact with all of the remaining plaintiffs that are still pending in these cases?"  Id.  To which Mr. Wilner replied, somewhat cryptically, "Yes, your Honor, within the possibilities of being able to express that because you can't talk to everybody at once."  Id.  So the court followed up, "within the last six months, all but the 332 that are identified in that motion have expressed that they are willing and able to proceed with these claims?  Is that your representation to the Court?"  Id. at 8–9.  Mr. Wilner replied, "Yes, absolutely. . . . [W]e are in constant contact with them."  Id. at 9.  Later in the hearing, the court asked again, "if you had to sign a Rule 11 complaint today on behalf of each one of these smokers who has a case that you can certify under Rule 11 [of the Federal Rules of Civil Procedure], how many people would that be?"  Id. at 29.  Mr. Wilner's response: "Twenty-eight hundred and whatever the last two digits are," id.—in other words, in all of the supposedly viable cases remaining on the District Court's docket.

19

The court also addressed plaintiffs' counsel's opposition to the Special Master's questionnaires. As part of this discussion the court explained, more than once, the need for accurate information regarding the number and type of viable claims and its frustration that plaintiffs' counsel didn't seem to possess this very basic information, even though more than two years had passed since filing.[13] Obviously the court wanted to purge the docket of non-viable claims, but it was just as important for purposes of streamlining the adjudication of the legitimate claims that the court have a handle on the basic characteristics of those claims:

> [W]e need to figure out what's the total constellation of lawsuits that we have? How can we divide them up in terms of do we have cases that have living people, we have death cases with survivors, we have death cases with no survivors? All of those, as you know, have—I mean, the elements of damage are going to be different with respect to each, and we are trying to figure out a way that we can triage these things and marshal them so that we can deal with them; and, frankly, we need some help, and we don't feel like we are getting it.

Doc. 171, at 17.

---

[13] See, e.g., Doc. 171, at 16:

[THE COURT:] [U]ntil we ordered you to do it, you hadn't done the work that we have now done, and I would have thought you would have. I would have thought—you know, I can even understand that as of January of '08 you had to meet a deadline and so you just met the deadline. I can understand that.

What I'm having trouble understanding that as it got into '09 and 2010, while things were on appeal, while we were in our process—we had two or three hearings with multi-judge panel hearings—until we actually ordered you to actually look at all these and to do the work that we have now done, it didn't appear to us you were doing it yourself, and I would have thought that you would have.

[I]t would be really useful if we knew, in looking at these claims, which ones are living people, which ones are claims with survivors, which ones are claims with survivors with—I doubt there are any with minor children, based on the time periods we are talking about, but if there are, what are those claims, and which are the cases we are dealing with no intangible claims but just economic losses.

. . .

That would be hugely helpful for us in terms of being able to try to figure out how and where and when we are going to get these cases tried.

Id. at 37.

In response to the court's request for more information, Mr. Wilner

explained that his firm, now with the assistance of Lieff Cabraser Heimann &

Bernstein, was in the process of collecting the information the Special Master

sought and would provide it to the court soon.  That wasn't good enough; in light

of the problems that had surfaced from the parties' first review of the docket, the

court told Mr. Wilner, though not in so many words, that it no longer trusted him.[14]

---

[14] [W]e started out thinking that we are dealing with 4500 cases, and now we are dealing with 29- and heading to 26-, . . . but it kind of turned out that we were never dealing with 4500.  Those were names on pieces of paper, then in large measure they weren't really cases.  So what we are interested in finding out is, how many real cases do we have, real people that want real relief that are entitled to ask for it? . . .

Let's say we do get this down to 2600, and then let's say we do this questionnaire.  Are half of the people going to not answer it?  Are we going to end up with 1200 cases? . . . You all say you are in contact with them, but the way you say it isn't giving us as much comfort as I would like it to.

Doc. 171, at 14–15.

21

And so the court asked plaintiffs' counsel how long it would take them to distribute and collect questionnaires. Mr. Wilner's co-counsel—Ms. Kathryn Barnett of Lieff Cabraser, who had been put in charge of compiling data on each plaintiff's case—answered that three months would be plenty of time since they were in contact with all their clients and in the process of gathering the information sought by the Special Master. After some dickering during and after the hearing, the parties and the court agreed to the form of the questionnaire,[15] that it would be

---

[A]s we kind of started poking at the pinata, every time the ten cases that you all proposed [to prepare for trial], there were problems with all ten of them. We thought those would be your gold-plated, ready-to-try cases, and they turn out to be anything but. Then when we start looking at the various dismissals and withdrawals and numbers have—we had double-filed cases, we had consortium claims that we didn't account for, we have lost a little bit of confidence in what we really have here.

. . .

[W]e assumed a level of preparedness and a level of involvement that really just hasn't, to our knowledge, been borne out by any further investigation.

Id. at 21–22.

[15] The parties agreed to the following questions:

1. Are you the person named in this case?

2. What year were you born?

3. Are you willing and able to participate in this case?

4. If you are bringing this action on behalf of another person, please provide that person's full name.

5. What year did the person you claim was injured by smoking begin smoking cigarettes?

6. If that person has died, what was the date of the death?

7. Have you or anyone opted-out of the Engle Class Action on behalf of the person you claim was injured by cigarette smoking?

22

completed under oath, and that plaintiffs' counsel would collect the responses and submit them to the court with a Rule 11 certification attached. See Doc. 218, at 5. The court eventually issued an order in August 2011, which gave plaintiffs' counsel three months to submit the questionnaires (and approximately five months from the June hearing).

Plaintiffs' counsel mailed questionnaires to 2,661 unique addresses, yet by the November 2011 deadline, they had submitted only 1,724 to the Special Master.

---

8. Have you or anyone else filed another lawsuit asserting these claims in any other court?

9. If the answer to Question 8 is "yes," where is the case filed? Is that case still proceeding?

10. List the Florida County in which the person you claim was injured by cigarette smoking resided for the longest time.

11. Did anyone make a claim to the Engle Trust Fund regarding the person you claim was injured by cigarette smoking?

12. If the answer to Question 11 is "yes," was the claim paid?

13. Please check the disease below that the person you claim was injured by smoking suffered at any time.

. . .

14. ANSWER THE QUESTIONS BELOW IF THE PERSON YOU CLAIM WAS INJURED BY SMOKING CIGARETTES IS NO LONGER LIVING

a.     Have you been appointed or legally authorized by a Court to represent the estate of the person you claim was injured by smoking cigarettes?

b.     If someone else has been appointed or legally authorized to represent his/her estate, who is it?

c.     What was your relationship to the person you claim was injured by smoking cigarettes? (e.g., spouse, child, sibling, etc.)

d.     List any living spouse or children of the deceased and the year of that person's birth.

Doc. 218–1.

23

They asked for more time, explaining to the court that they were now putting on a full-court press—mailings, phone calls, emails, and door-to-door visits—to try to reach all their clients and obtain completed questionnaires from them. See Doc. 359. In light of all that had already transpired, including plaintiffs' counsel's repeated assurances that they were in "constant contact" with all the plaintiffs, the court denied their request to extend the deadline, though it did afford counsel the opportunity to submit late questionnaires upon a showing of good cause. See Doc. 379.

In the meantime, the Special Master compiled data on the 1,724 questionnaires that counsel submitted on time. A number of problems cropped up; for example, 521 personal injury plaintiffs had been dead at the time of filing—some for quite a long time;[16] 66 wrongful death actions were brought on behalf of

---

[16] Defendants provided the following summary table of the predeceased personal injury plaintiffs' dates of death:

| Year of Death of the "Personal Injury Plaintiff" | Number of Cases |
| --- | --- |
| 1978 | 1 |
| 1979 | 1 |
| 1986 | 1 |
| 1988 | 1 |
| 1990 | 4 |
| 1991 | 6 |
| 1992 | 7 |
| 1993 | 12 |
| 1994 | 13 |
| 1995 | 21 |
| 1996 | 30 |
| 1997 | 47 |

24

"survivors" of a smoker who was still alive; 64 wrongful death cases involved deceased smokers with no survivors; and 39 wrongful death cases involved smokers who died more than two years before the Engle class action was filed (as noted, Florida's wrongful death statute has a two-year limitations period, Fla. Stat. § 95.11(4)(d)). See Doc. 503, at 7–14. These problems and others led the Special Master to conclude that even "the current universe of 1,700 cases [in which questionnaires were returned] is still inflated to an unknown extent by (1) less than enthusiastic or capable plaintiffs and (2) weak, even nonviable, claims." Id. at 4.

For today's purposes, we only focus on two of these problems: the predeceased personal injury plaintiffs and the decedent-smokers who died more than two years before Engle was filed. It is worth noting before we proceed that the questionnaire process culled hundreds more cases from the District Court's docket, including over 1,000 in which no questionnaire was ever submitted, even after the court twice allowed plaintiffs' counsel to submit late questionnaires.

| | |
|---|---|
| 1998 | 41 |
| 1999 | 45 |
| 2000 | 33 |
| 2001 | 45 |
| 2002 | 38 |
| 2003 | 41 |
| 2004 | 35 |
| 2005 | 26 |
| 2006 | 41 |
| 2007 - Jan. 8, 2008 | 32 |

Doc. 582, at 3.

25

B.

In response to the Special Master's findings, the tobacco defendants moved to dismiss[17] the 521 personal injury cases involving predeceased plaintiffs and the 39 wrongful death cases involving smokers with dates of death more than two years before Engle was filed (for a convenient shorthand, these smoker-decedents died before May 5, 1992). For ease of discussion, we will recount the parties' arguments and the court's reasons for dismissing each category separately, beginning with the smokers who died more than two years before the Engle class action was filed.

1.

The defendants moved to dismiss the 39 wrongful death cases as time-barred. See Doc. 581. Their argument was simple: the two-year limitations period in the Florida Wrongful Death Act expired before Engle began, and so the Engle proceedings did not toll the limitations period. Thus, when the claims were filed in 2008, they were untimely.

Plaintiffs' counsel conceded that the limitations period had not been tolled by the Engle class action; however, they contended that the doctrines of fraudulent concealment, equitable tolling, or equitable estoppel were available in these

---

[17] Because plaintiffs' counsel submitted the questionnaires with a Rule 11 certification, the smokers' dates of death were incorporated into the pleadings, and so a motion to dismiss was the appropriate vehicle for considering the viability of these cases.

wrongful death cases.  The original complaints did not mention any of these legal theories but did contain allegations that the defendants had concealed the health effects of smoking.[18]  From those allegations, plaintiffs' counsel argued that the original complaints "allege[d] sufficient predicate facts to establish both tolling and estoppel."  Doc. 590, at 9.  Plaintiffs' counsel did not carefully explain how those allegations fit into their proffered legal theories; instead, it would appear that they simply threw out a few doctrines and hoped that one would stick.[19]  Boiled

---

[18] Plaintiffs' counsel cited to the following language from one of their multi-plaintiff complaints:

> Defendants . . . agreed to conceal or omit information regarding the health effects of cigarettes, or their addictive nature, with the intention that smokers and the public would rely on this information to their detriment.
>
> . . .
>
> Defendants concealed or omitted material information not otherwise known, or available, knowing that the material was false or misleading, or failed to disclose a material fact concerning the health effects or addictive nature of smoking cigarettes, or both.

Doc. 590-1 at 13.

[19] For context, we provide the District Court's basic description of each doctrine:

> "[I]n order to establish fraudulent concealment sufficient to toll the statute [of limitations], the plaintiff must show both successful concealment of the cause of action and fraudulent means to achieve that concealment."

Doc. 835, at 11 (quoting Berisford v. Jack Eckerd Corp., 667 So. 2d 810, 811 (Fla. 4th Dist. Ct. App. 1995)).

> Equitable estoppel may deflect a statute of limitations where ["]one party lulls another into a disadvantageous legal position." [Major League Baseball v. Morsani, 790 So. 2d 1071, 1076 (Fla. 2001)].  In contrast, equitable tolling does not require misconduct on the part of the defendant. [Id. at 1277 n.11].  Rather, it delays the running of the limitations period "based on the plaintiffs' blameless ignorance and the lack of prejudice to the defendant." Id.  "It may also be used when 'a plaintiff has been misled or lulled into inaction and has in some extraordinary way been prevented from asserting his rights.'" Aruanno v. Martin

27

down, their argument was that the defendants covered up the health effects of smoking, and as a result, the plaintiffs shouldn't be held to the normal two-year period for filing a wrongful death suit. For convenience, we will refer to plaintiffs' counsel's theories for avoiding the statutes of limitations bars collectively as "equitable tolling."

As another basis to preserve some of these cases, plaintiffs' counsel argued that, in cases in which the decedent-smoker died after May 5, 1990, the four-year limitations period applicable to survival actions, Fla. Stat. § 95.11(3), had not run by the time Engle began. The original complaints did not allege survival claims though, only wrongful death claims.[20] Nevertheless, plaintiffs' counsel argued that

---

Cnty. Sheriff, 343 F. App'x 535, 537 n.2 (11th Cir. 2009) (quoting Alachua Cnty. v. Cheshire, 603 So. 2d 1334, 1337 (Fla. 1st Dist. Ct. App. 1992)).

Id. at 14–15.

[20] Under Florida law, when a person suffers injury at the hands of a tortfeasor and subsequently dies, the personal representative of the decedent's estate may maintain either a wrongful death claim or a claim for survival damages. Which type of claim is viable depends on the cause of the decedent's death: If the decedent died as a result of the injuries caused by the tortfeasor, the appropriate cause of action is a wrongful death claim brought by the personal representative for the benefit of the decedent's survivors. See Fla. Stat. § 768.20; Martin v. United Sec. Servs., Inc., 314 So. 2d 765, 769–70 (Fla. 1975). If the decedent died for some unrelated reason—i.e., not as a result of the tortfeasor's actions—the personal representative can maintain a claim for survival damages on behalf of the deceased. See Fla. Stat. § 46.021; Smith v. Lusk, 356 So. 2d 1309, 1311 (Fla. 2d Dist. Ct. App. 1978). Where the cause of death is in dispute, the personal representative may plead both a survival action and a wrongful death action in the alternative. Lusk, 356 So. 2d at 1311; Capone v. Philip Morris USA, Inc., 116 So. 3d 363, 377 (Fla. 2013).

The damages recoverable under each type of claim differ: A survival action allows recompense for the decedent's damages (that accrued while the decedent was still alive)—e.g., the decedent's pain and suffering, medical expenses, loss of earnings, etc. See Martin, 314 So.

28

"the complaints contain sufficient allegations to raise alternative survival theories," and so "Defendants should have been on notice that Plaintiffs intended to allege alternative survival claims . . . ." Doc. 590, at 12.

In the alternative to both arguments—that is, if the District Court determined that the original complaints failed to contain sufficient factual allegations to establish equitable tolling or a survival claim—plaintiffs' counsel asked that they be allowed to amend the complaints to remedy these shortcomings. They did not come forward with any proposed amendments at that time, though.

---

2d at 767. A wrongful death claim focuses on the loss suffered by the survivors or the estate, not the decedent—allowing recovery for, e.g., the survivors' loss of support services and loss of consortium, survivors' pain and suffering, and medical bills or funeral expenses borne by survivors or the estate. See Fla. Stat. § 768.21; Martin, 314 So. 2d, at 768–69.

The exemplar complaint plaintiffs' counsel attached to their opposition memorandum contained the following relevant allegations:

> This is a complaint seeking compensatory and punitive damages in accordance with the Florida Wrongful Death Act . . . .
>
> . . .
>
> Decedents died of their tobacco related illnesses.
>
> . . .
>
> The named personal representatives . . . bring this claim on behalf of the estate of the decedent and any survivors that qualify under the Florida Wrongful Death Act.

Doc. 590-1, at 9.

> As a proximate result of the actions of the defendants as stated above each Survivor and the estate has suffered damage and injury including medical and funeral expenses, loss of support and services, mental pain and suffering, interest and expenses, as defined in the Florida Wrongful Death Act.

Id. at 14.

29

2.

On November 26, 2012, the District Court issued an order dismissing 37 of the 39 wrongful death cases.[21]  The court concluded that the original complaints' allegations—that the defendants covered up the health effects of smoking—were not sufficient to establish equitable tolling.  Likewise, the court found that the complaints clearly alleged only wrongful death claims and therefore that plaintiffs' counsel could not rely on the longer limitations period applicable to survival actions.

The court declined to grant plaintiffs' counsel leave to amend, citing multiple reasons.  First, the request for leave to amend was only presented in plaintiffs' counsel's response memorandum to the defendants' motion to dismiss.  Doc. 835, at 18 n.15 (citing Rosenberg v. Gould, 554 F.3d 962, 967 (11th Cir. 2009) ("Where a request for leave to file an amended complaint simply is imbedded within an opposition memorandum, the issue has not been raised properly.")).  Second, Plaintiffs' counsel did not "set forth the substance of the proposed amendment or attach a copy of the proposed amendment," as required.  Id. (quoting Long v. Satz, 181 F.3d 1275, 1279 (11th Cir. 1999)).  Third, Plaintiffs' counsel "do not claim to have new information [regarding the defendants' conduct

---

[21] In the interim period, plaintiffs' counsel voluntarily moved to dismiss the other two wrongful death cases (their given reason: "statute of limitations"), and the court granted their motions.  See Doc. 835, at 8 n.10.

that would have entitled them to equitable tolling] that they could not have alleged at the time the complaints were filed," and they "had years after the smokers died . . . to learn what caused the deaths" (and thus whether to file wrongful death claims or survival claims). Id. at 18. And fourth, "Defendants would be unduly prejudiced by the addition of these claims, at this stage of this already protracted litigation, particularly when they have been raised in the face of a statute of limitations defense." Id. at 19. Therefore, the court concluded that "any amendment would either be futile or unjustified and would cause undue prejudice to Defendants." Id.

3.

Plaintiffs' counsel did not appeal this November 2012 order. The order is relevant to these appeals because the District Court later granted plaintiffs' counsel leave to submit 170 questionnaires received after the November 2011 deadline. See Doc. 604, at 5; Doc. 927, at 4. The late questionnaires revealed two more smoker-decedents who died before May 5, 1992. The defendants moved to dismiss these two wrongful death cases based on the court's unappealed November 2012 order. Docs. 933, 937. Plaintiffs' counsel opposed the motion. They incorporated their previous arguments into their response memorandum with some modifications to bolster their request for leave to amend; to wit, plaintiffs' counsel styled their responsive filing as a "cross-motion" and included in it the proposed

31

amendments that, they claimed, entitled them to equitable tolling.[22]  Plaintiffs'

counsel did not include in their proposed amendments any new survival claims.

---

[22] The new allegations were as follows:

1. Defendants took affirmative steps to conceal not only the health effects and addictive nature of smoking, but also their wrongdoing, including the existence and nature of their fraudulent 50-year conspiracy to cast doubt on the link between smoking and disease, their efforts to manipulate nicotine to make their products as addictive as possible, and their knowledge that "light," "low-tar" and "filtered" cigarettes offered no health benefit over regular cigarettes (despite their marketing these products as safer alternatives to those who were trying to quit);

2. Defendants concealed their wrongdoing for the purpose of avoiding litigation and preventing their injured customers and their families from asserting their rights within the statutory period;

3. Plaintiffs did not discover, nor could have discovered these facts giving rise to their claims within two years of the decedents' death, despite the exercise of due diligence, since this information did not become publicly available until 1996 (at the earliest), when the cigarette companies were forced to turn over their internal documents in litigation;

4. Defendants' affirmative acts—specifically, their concealment of their prior fraud and wrongdoing for the purpose of avoiding lawsuits like these—lulled Plaintiffs into inaction post-death; and

5. Plaintiffs reasonably relied to their detriment, on Defendants' concealment of their wrongdoing, which prevented them from bringing their action within two years of their death.

Doc. 971, at 2–3.

Plaintiffs' counsel also argued for the first time that they were entitled to amendment as a matter of course under Rule 15(a)(1), which provides:

A party may amend its pleading once as a matter of course within: (A) 21 days after serving it, or (B) if the pleading is one which a responsive pleading is required 21 days after service of a responsive pleading or 21 days after service of a motion under Rule 12(b), (e), or (f), whichever is earlier.

Fed. R. Civ. P. 15(a)(1).  Plaintiffs' counsel believed they were entitled to amendment as a matter of course because the defendants had not filed an answer in these two wrongful death cases after the court ordered that a new docketed case be created for each of the 4,432 plaintiffs. The defendants had filed answers to the original multi-plaintiff complaints that included these two wrongful death claimants.  In its order dismissing these two wrongful death cases, the District Court did not mention plaintiffs' counsel's argument that they had a right to amend as a matter of course.  Likewise, we do not devote any further attention to this argument, since the

32

On June 17, 2013, the District Court rejected plaintiffs' counsel's old and new arguments and dismissed the two wrongful death cases.  Doc. 1101.  The court adopted the reasoning from its November 2012 order to reject counsel's recycled arguments.  Addressing plaintiffs' counsel's new arguments, the court wrote, "The specific allegations Plaintiffs now seek to add in order to establish fraudulent concealment tolling, equitable estoppel, or equitable tolling do not change the Court's analysis."  Id. at 3.  Plaintiffs' counsel appealed this second order (appeal no. 13-12901), which we consolidated with their appeals from the court's orders described in the following section.

## C.

### 1.

Turning now to the 521 personal injury cases involving predeceased plaintiffs: the defendants sought dismissal of these cases on the theory that

> the 521 'personal injury' actions were nullities on the day they were filed in 2008, were nullities a few days later when the final 'savings' period expired on all Engle Progeny claims, and are still nullities today. . . . [T]he only legally possible result is the dismissal of those filings—filings which conferred no jurisdiction on this Court and likewise provide no basis for any amendment to assert a different claim or 'substitution' of a new plaintiff to assert claims that were time-barred, even under the extended limitations period, more than four years ago.

---

defendants filed answers to the multi-plaintiff complaints that preceded these two wrongful death cases.

Doc. 582, at 5.

In response, plaintiffs' counsel urged the court to reject the defendants' nullity theory as an anachronism and instead give them 120 days to seek leave to amend in these cases to substitute in personal representatives of the deceased smokers' estates and allege wrongful death or survival claims. See Doc. 589. Plaintiffs' counsel cited to Rules 15 and 17 of the Federal Rules of Civil Procedure to require such an opportunity.[23]

Along with their response, plaintiffs' counsel submitted a sworn declaration by Mr. Wilner, in which he described the circumstances that led him to file suit on behalf of 521 dead people. He explained: In the late-1990s, his firm represented over 3,000 smokers or their families. All of these clients "were signed into contractual agreements giving the firm latitude as to the appropriate method to preserve and advance their claim[s] against the cigarette companies." Doc. 589-1, at 1. By the time Engle III came down, his firm "had successfully remained in contact with most but not all of these clients," though "some had been lost to follow up." Id. at 2. His firm was unable to reestablish contact with some portion

---

[23] Rule 15(a) allows parties to amend their pleadings once as a matter of course, provided it is done within a short period after the filing of a responsive pleading, and after that, "only with the opposing party's written consent or the court's leave," which "[t]he court should freely give . . . when justice so requires." Fed. R. Civ. P. 15(a)(2). Rule 17(a) provides, "The court may not dismiss an action for failure to prosecute in the name of the real party in interest until, after an objection, a reasonable time has been allowed for the real party in interest to ratify, join, or be substituted into the action." Fed. R. Civ. P. 17(a)(3). We discuss these rules and their application to these personal injury claims in more detail below.

of these individuals by the time the savings period ran out, but he decided that it was his "professional duty to make protective filings on behalf of these clients," so he simply filed personal injury claims on behalf of the party who had contacted his firm back in the '90s. Id. After he filed suit, he kept trying to track down his nonresponsive clients, and eventually "efforts to locate survivors were successful in all but a few cases, and those survivors ratified the filings nunc pro tunc." Id. Obviously, when he located the survivors of his nonresponsive clients, he learned that these clients were nonresponsive because they had died; however, he did not seek to amend the complaints or otherwise inform the court that these personal injury plaintiffs were deceased because "the cases were stayed immediately after filing upon agreement of the parties," and so "efforts to amend the pleadings to reflect the status of the deceased were stayed as well." Id. at 3.

The court heard argument regarding the predeceased plaintiffs' cases in June 2012. During the hearing, which Mr. Wilner did not attend, the court openly questioned many of the statements in his declaration and pressed Mr. Wilner's co-counsel—Ms. Elizabeth Cabraser, of Lieff Cabraser—for more information. In light of the fact that Mr. Wilner hadn't had any recent contact with these "clients" when he filed claims on their behalf in 2008, the court found it highly unlikely that he had any authorization to file suit or that he had investigated the validity of these claims. Moreover, the court pointed out, a number of the predeceased plaintiffs

had died before Mr. Wilner even started collecting tobacco clients—a group that Mr. Wilner's declaration had not even mentioned.  Ms. Cabraser didn't have any answers for the court; she explained that she hadn't been around back then and so she just stood on Mr. Wilner's (incomplete) declaration.[24]

The court also doubted that plaintiffs' counsel had really tracked down and received authorization "nunc pro tunc" from these predeceased plaintiffs' survivors.  In fact, the court asked Ms. Cabraser if the attorneys had only learned of all these predeceased plaintiffs once they received responses to the questionnaires; her reply: "I don't know."  Doc. 677, at 62.  As for the suggestion that the stay—which the court left in place at the parties' request to help manage the mass of cases—absolved plaintiffs' counsel of any obligation to fix their mistakes in a timely manner or otherwise inform the court that in 521 of the cases they had pled the wrong cause of action and named the wrong plaintiff, the court tersely responded, "Really?"  Id. at 59.  And addressing plaintiffs' counsel's

---

[24] See, e.g., Doc. 677, at 64:

[THE COURT:]  [I]f Mr. Wilner was here, I would be asking Mr. Wilner this question . . . what possible right did you have—what possible explanation could you give for representing to the Court that I have done a good faith investigation into the facts and circumstances surrounding this case and am prepared to certify to the Court that the claim is bona fide, it is viable, and that it is made in good faith?

. . .

[MS. CABRASER:]  Your Honor, I can't speak for Mr. Wilner.  I am not Mr. Wilner, but you have Mr. Wilner's declaration on the circumstances surrounding the original filing of these complaints based on information that was in his files.

request that they now be allowed to go back and fix all their mistakes, the court

had this to say:

> These cases were filed, clearly, with no authorization from the client, with no compliance with Rule 11, with no good faith inquiry into whether or not there was a viable basis for a claim, and now the Court is being asked under the purview of Rule 15 to somehow allow you to amend and relate back to a pleading that was filed on behalf of someone that was long dead and never authorized the institution of the action somehow under the rubric of doing justice and putting the Court in the position of ["]how can you not allow these people to have a claim brought on their behalf[?"]
>
> It's an untenable situation, Miss [Cabraser], that you are asking the Court to occupy . . . .

Id. at 59–60.  Despite these voiced misgivings, the court did not immediately rule

on the defendants' motion to dismiss.

A few months later, while the defendants' motion to dismiss was still

pending, the defendants also moved for a Rule 11 inquiry into plaintiffs' counsel's

filing and maintenance of these 521 cases.  See Doc. 813.  In response, Mr. Wilner

came forward with more information—much of which was inconsistent with his

earlier sworn declaration.

In his "Verified Response" to the defendants' Rule 11 motion, Mr. Wilner

explained that in the 1990s his firm interviewed around 6,000 smokers or family

members of smokers, many of whom provided "information sufficient for us to

believe that such client wanted us to act on their behalf should circumstances deem

37

it advisable." Doc. 822, at 4. He further explained: because "[t]here is normally no need to monitor individual class members" during the pendency of a class action, the Florida Supreme Court's decertification of the class and authorization of individual lawsuits "imposed a unique and exigent circumstance on the few firms, including ours, whose last contacts with these class members could well be decades old." Id. at 4–5. Thus, during the Engle III savings period, The Wilner Firm had to scramble to track down everyone on the list of "clients" it compiled in the mid-'90s. His firm tried "mailing, calling, visits to last addresses, talking to neighbors, [and] other methods," but some undisclosed portion didn't respond before the Engle III deadline. Id. at 5–6. Obviously The Wilner Firm didn't know "whether the nonresponse was due to death, illness, changing addresses, entering a nursing home, being unwilling to proceed, or some other reason," so, "[i]n the absence of re-contact, [it] evaluated each claim based on the information on hand," and filed suit if there was a cognizable claim. Id. at 6–7.

After The Wilner Firm filed suit on behalf of an undisclosed number of nonresponsive individuals, it successfully contacted "many" of them "within a few months after the filing deadline." Id. at 8. Of the nonresponsive clients who turned out to be dead, 339 survivors were successfully contacted by mid-2008—in time for The Wilner Firm to submit claims to the Engle Trust Fund on their

38

behalf.[25]  The firm continued its efforts to reach the remaining nonresponsive clients, and eventually survivors were identified for all of the 500-plus predeceased plaintiffs; these survivors are the ones who completed the court-ordered questionnaires.  Thus, of the claims brought on behalf of predeceased clients, The Wilner Firm was aware of "most but not all" that were "mis-styled" before the questionnaire process.  Id. at 9.  Mr. Wilner decided not to bring that "mis-styling" to the court's attention because the cases were stayed; instead, he planned to file an amended complaint in each case after the court lifted the stay in that particular case.  Id. at 8–9.

Along with the Verified Response, Mr. Wilner submitted summary data from his firm's files showing the date of death for each smoker and dates of contact between his firm and smokers or their survivors.  In most cases, the last date of contact The Wilner Firm had with the predeceased plaintiffs was in the late-'90s—nearly a decade before lawsuits were filed on these individuals' behalf.  See Doc. 822-1.  In all but a handful of cases, The Wilner Firm had not heard from its "clients" for over five years by the time Mr. Wilner filed suit.  And in around 100 cases, the smoker died before the last date of contact listed in Mr. Wilner's

---

[25] The Engle Trust Fund was set up by the tobacco defendants as a negotiated alternative to posting bond to cover the $145 billion punitive damages award from the original Engle trial.  The purpose of the fund was to provide some compensation to class members, regardless of the ultimate outcome of the Engle appeals.  To receive compensation from the fund, claimants had to submit documentation showing them to be Engle class members.  The deadline to submit claims was June 16, 2008—approximately six months after the Engle III savings period expired.

data, meaning, presumably, that The Wilner Firm had been in contact with these deceased smokers' survivors and knew that the smokers had died.  Mr. Wilner's explanation for his firm's filing of personal injury claims on behalf of these smokers: "an error of unknown origin," which "could have occurred through data entry error, mis-communication between our firm and the person providing the information, a misunderstanding on behalf of the person . . . , or for any number of reasons that can never be determined."  Doc. 822, at 13–14.

2.

On January 22, 2013, the District Court entered an order granting the defendants' motion to dismiss the 521 cases identified by the Special Master.  The court gave multiple reasons.  First, it agreed with the defendants that "a lawsuit filed in the name of a deceased individual is a nullity over which this Court has no jurisdiction."  Doc. 925, at 5.  The court recognized that, "under certain circumstances when the proper cause of action is alleged but the plaintiff lacks capacity, or where the plaintiff dies after the complaint has been filed, substitution and amendment may be proper under Rules 17, 25, or 15."  Id. at 9.  But, because plaintiffs' counsel filed personal injury actions that were never viable, "no substitution or amendment can save these claims"; "the proper course would have been to file either wrongful death or survival claims before the expiration of the Engle savings period."  Id. at 9 & n.7.

40

In the alternative, the court explained that even if the personal injury cases were not nullities ab initio, plaintiffs' counsel still couldn't substitute in the decedents' personal representatives because Rule 17 "is intended to prevent forfeiture when determination of the proper party to sue is difficult or when an understandable mistake has been made." Id. at 9 (quoting Fed. R. Civ. P. 17, Advisory Comm. Notes, 1966 Amend.). The court clearly did not find Mr. Wilner's 521 mistakes to be understandable:

> [T]he Florida Supreme Court . . . decertified the Engle class action and gave individuals a one-year period, ending on January 11, 2008, in which to file lawsuits. In doing so, the supreme court gave counsel for the plaintiffs a year to further investigate the claims and, at the very least, to determine the status of their clients, including whether their clients were still alive and interested in pursuing the action. Mr. Wilner acknowledges in his declaration that these cases were "protective filings" on behalf of clients who could not be located and whose status was unknown. However, whether counsel undertook any significant effort during that year to confirm the status of their clients remains unestablished in the record. The filing of personal injury claims on behalf of these 521 individuals who were already dead (some had been dead for many years) suggest counsel may not have.

Id. at 10.

Moreover, Mr. Wilner's failure to inform the court for over four years that he had so many invalid cases sitting on the docket—while the court took pains to winnow the docket and catalog the viable cases—further weighed against his request to change the parties and claims in over 500 cases. In fact, the court noted, rather than bringing the defective complaints to its attention, counsel continually

41

reassured the court that all remaining cases were viable and that they were in constant contact with all remaining plaintiffs. And yet, when the Special Master reviewed the questionnaires, 521 plaintiffs turned out to be dead (and hundreds more never submitted questionnaires). That the court had issued a stay order in those cases "did not prevent counsel from inquiring into the status of their clients and bringing any change in status to the Court's attention." Doc. 925, at 11. As a matter of fact, plaintiffs' counsel had filed several such motions in stayed cases, seeking to substitute in personal representatives for smoker-plaintiffs who died after filing. Thus, the court concluded, "[e]ven assuming arguendo that, given this unique situation, the Court could have relieved Plaintiffs from their improper filings, Plaintiffs and their counsel lost any claim to such consideration when they did not timely alert the Court to the problem. Plaintiffs slept on whatever rights they may have had to amend their complaints and file in the name of the proper parties." Id. at 12.

The court ordered that the personal injury cases be dismissed with prejudice. It reserved jurisdiction over the cases "for the limited purpose of making further inquiry and addressing the circumstances of the filing of these cases, as well as any Rule 11 implications." Id. at 11 n.8. The list of cases to be dismissed, which had been compiled by the Special Master and attached to the defendants' motion to dismiss, listed 521 names and docket numbers corresponding to the predeceased

42

smokers and their personal injury cases.  See Docs. 503-5, 582-1, 925-1.  Listed alongside 132 of these personal injury cases were names and docket numbers corresponding to loss of consortium cases maintained by the spouses of these predeceased plaintiffs.  Neither the parties nor the Special Master specifically mentioned the 132 loss of consortium cases, nor did plaintiffs' counsel object to their dismissal.  The court's order also did not independently explain its dismissal of the consortium cases.

3.

Plaintiffs' counsel filed a timely appeal from the January 2013 order (appeal no. 13-10839).  In their opening brief, they asked this court to (1) reverse the District Court's dismissal of the 521 personal injury cases filed on behalf of predeceased plaintiffs, (2) grant plaintiffs' counsel leave to file a Rule 60(b) motion in the District Court to allow the court to correct its "mistake" in dismissing the 132 consortium cases,[26] and (3) grant "a limited remand" to allow the District Court to reinstate three cases in which the named plaintiff-smoker had in fact been alive at the time of filing (a fact that plaintiffs' counsel apparently discovered after taking their appeal).  In their reply brief, they identify four more such cases.

---

[26] Rule 60(b) allows a party to seek relief from a judgment for, among other things, "mistake, inadvertence, surprise, or excusable neglect."  Fed. R. Civ. P. 60(b)(1).

43

While this appeal was pending, the District Court discovered and dismissed 67 more personal injury cases brought on behalf of predeceased plaintiffs and 40 more loss of consortium cases that derived from a personal injury case involving a predeceased plaintiff. Most of these cases came to light after the court granted plaintiffs' counsel leave to submit the 170 late questionnaires. Upon defendants' motion, the court dismissed the 67 personal injury cases for the reasons given in its January 2013 order. Doc. 1101. (This is the same order, issued in June 2013, in which the court dismissed the two wrongful death cases involving dates of death before May 5, 1992—which also cropped up after the court allowed plaintiffs' counsel to submit the late questionnaires.) Like the list of cases attached to the January 2013 order, the list of cases attached to the June 2013 order included three consortium case numbers paired with the corresponding personal injury case. See Doc. 1101-1. Plaintiffs' counsel again did not object to the dismissal of the consortium cases. We consolidated plaintiffs' counsel's appeal from the June 2013 order (no. 13-12901) with their appeal from the January 2013 order (no. 13-10839).

The remaining 37 loss of consortium cases were identified during an audit of the docket, conducted by the parties and the Special Master at the court's request, to identify any cases that were due to be dismissed based on orders already issued by the court. See Doc. 975. These 37 consortium cases were derivatives of

personal injury cases dismissed by the January 2013 order—they hadn't been paired together before that order.[27] The defendants sought to administratively close the cases because they had effectively been dismissed by the court's January 2013 order.  See Doc. 1012, at 2.  Because plaintiffs' counsel indicated their intention to oppose such action, the defendants also argued (1) that the loss of consortium cases were wiped out by Florida's wrongful death statute upon the death of the smoker—meaning the only viable cause of action was a wrongful death case brought by the decedent's survivors (which should have been filed back in 2008); and (2) in the alternative, the consortium cases were barred by the statute of limitations because the Engle class representatives had not alleged independent consortium claims and, therefore, the limitations period had not been tolled by the Engle class action or the Engle III savings period.[28]

Plaintiffs' counsel did not oppose the dismissal of 12 of the 37 consortium cases.  Doc. 1020, at 1 n.1.  As for the remaining 25, plaintiffs' counsel argued that the cases were independently viable, even though the personal injury cases they were associated with had been dismissed, because "these complaints were filed by

[27] In fact, for 21 of the 37 consortium cases that defendants moved the court to dismiss, the name of the spouse/consortium plaintiff had been listed in the court's January 2013 order but the docket number had not been separately listed (as it was for the 132 consortium cases that were dismissed by the January 2013 order).

[28] Under Florida law, to receive the benefit of class action tolling, "the claims in the later action [must be] the same as those alleged in the earlier [class] action."  Hromyak v. Tyco Int'l Ltd., 942 So. 2d 1022, 1023 (Fla. 4th Dist. Ct. App. 2006).

45

living persons who had capacity to sue." Id. at 1. Yet plaintiffs' counsel apparently agreed that these plaintiffs could not pursue standalone loss of consortium claims because they sought leave to amend the complaints to allege wrongful death claims or survival claims (ostensibly to be maintained by these 25 plaintiffs in their capacity as the personal representatives of the decedents' estates). They did not propose such amendments at that time; rather, they stated their intention to "allege additional facts that would establish a sufficient basis for alternative wrongful death and survival claims." Id. at 6. As for the defendants' argument that the limitations period was not tolled by the Engle class action, plaintiffs' counsel explained that the Engle III court never said that "spouses of Engle class members should not be allowed to proceed with claims for loss of consortium," and therefore, counsel asserted, the Engle class action tolled the limitations period for such consortium claims. See Doc. 1020, at 5 (emphasis added).

On August 16, 2013, the District Court issued an order dismissing the loss of consortium cases as time barred. Doc. 1130. The court explained: The Engle class representatives did not bring standalone loss of consortium claims. "The plain language of the class definition was limited to living smokers and the survivors of deceased smokers"—not "'spouses,' 'children,' or 'family members' of the smokers." Id. at 4. And "though derivative of and dependent on the injured

46

plaintiff's ability to recover, loss of consortium claims are 'separate and distinct' under Florida law . . . , as they are 'brought on behalf of a separate party and may be maintained in situations where the injured party has not been joined.'" Id. at 6 (quoting Ruffo v. R.J. Reynolds Tobacco Co., No. 07-30292 CA 24, ¶ 8 (Fla. 11th Jud. Cir. Apr. 30, 2012)). Thus, "[b]ecause they were not included in the Engle case and are distinct claims, tolling by the Engle savings period does not apply to save the Plaintiffs' loss of consortium claims." Id. at 7. Because the original consortium claims were untimely, any amendment to those claims (even if it related back under Rule 15(c)) would also be untimely; thus the court denied plaintiffs' counsel's request for leave to amend as futile.[29]

In closing, the court discussed its earlier unexplained dismissal of the 132 consortium cases in its January 2013 order as follows:

> The Court does not rely on the fact that the January 22, 2013 Order
> dismissed some consortium claims in reach[ing] the determinations
> reflected [by] this Order. Rather, dismissing all consortium cases
> is proper for the reasons stated above. However, it is inaccurate
> for either side to suggest that they either affirmatively moved to

---

[29] In the alternative, the court denied plaintiffs' counsel's "motion" to dismiss because (a) "though nominally a 'cross-motion,'" plaintiffs' counsel's "request for leave to amend a pleading[] is not properly made when simply included in a response to a motion," Doc. 1130, at 10 n.8 (citing Fed. R. Civ. P. 7(b); Rosenberg v. Gould, 554 F.3d 962, 967 (11th Cir. 2009)); and (b) "the request is otherwise due to be denied based upon Plaintiffs' failure to satisfy the requirement that '[a] motion for leave to amend should either set forth the substance of the proposed amendment or attach a copy of the proposed amendment,'" id. (quoting Long v. Satz, 181 F.3d 1275, 1279 (11th Cir. 1999)). The court also questioned whether the proposed new wrongful death or survival claims would relate back under Rule 15(c): "Among other things, such a dramatic transformation of these cases, after they have been pending for more [than] five years, would certainly prejudice [the defendants]." Doc. 1130, at 11 n.9.

dismiss those consortium cases or specifically argued against dismissal in briefing the initial motion to dismiss.

Doc. 1130, at 12.

Plaintiffs' counsel filed a timely appeal from this August 2013 order (appeal no. 13-14302), which we consolidated with their appeals from the January 2013 and June 2013 orders.

D.

The table below summarizes the District Court's orders we review in these consolidated appeals.

| Date | ECF no. | Cases Dismissed | Appeal no. |
|---|---|---|---|
| Nov. 26, 2012 | 835 | 37 wrongful death cases filed on behalf of survivors of smokers who died before May 5, 1992 | No appeal |
| Jan. 22, 2013 | 925 | 521 personal injury cases filed on behalf of predeceased smokers, and<br>132 loss of consortium cases filed on behalf of family members of predeceased smokers | 13-10839 |
| June 17, 2013 | 1101 | 67 personal injury cases filed on behalf of predeceased smokers,<br>3 loss of consortium cases filed on behalf of family members of predeceased smokers, and<br>2 wrongful death cases filed on behalf of survivors of smokers who died before May 5, 1992 | 13-12901 |
| Aug. 16, 2013 | 1130 | 37 loss of consortium cases filed on behalf of family members of predeceased smokers, only 25 of which were opposed | 13-14302 |

We begin by discussing the 588 personal injury cases, then the 160 loss of consortium cases, and lastly the 2 wrongful death cases.

III.

48

As explained, the District Court gave a few reasons for dismissing the 588 personal injury cases involving predeceased plaintiffs: (a) the personal injury claims are nullities and thus not subject to amendment or a substitution of the plaintiff; (b) even if the claims weren't nullities, Rule 17 does not enable plaintiffs' counsel to substitute in personal representatives for all of the predeceased smokers because they had not shown that Mr. Wilner's 588 mistakes were understandable; and (c) even if plaintiffs' counsel could have substituted in new plaintiffs and amended the allegations shortly after filing, their attempts to do so four years later, and only after the court-ordered questionnaires revealed all the predeceased smokers, came far too late.

It is uncontested that the personal injury cases were properly dismissed—whether nullities ab initio or not—if the complaints cannot now be amended to substitute in the personal representatives of the decedents' estates and allege wrongful death claims or survival claims on their behalf.  Because we find the court's decision to deny leave to amend to be eminently reasonable, we need not consider whether a personal injury claim brought on behalf of a deceased individual has any legal effect, such that it can later be amended.[30]

---

[30] The District Court concluded, based on the nullity theory, that it had no jurisdiction over the predeceased plaintiffs' complaints.  Normally, we must address the jurisdictional issues in an appeal first because we cannot reach the merits until we are satisfied that we have jurisdiction to consider them.  See Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 94, 118 S. Ct. 1003, 1012, 140 L. Ed. 2d 210 (1998).  But that general rule does not apply here because the Rule 17 and Rule 15 issues presented are procedural and do not require us to pass judgment

We begin with the Federal Rules of Civil Procedure that govern the amendment of pleadings and substitution of parties and then explain our reasons for affirming the District Court's application of those rules.

A.

Rule 15 allows parties to amend their pleadings once within a short time after the filing of responsive pleadings, and after that, "only with the opposing party's written consent or the court's leave," which "[t]he court should freely give . . . when justice so requires." Fed. R. Civ. P. 15(a)(2). The thrust of Rule 15(a) is to allow parties to have their claims heard on the merits, and accordingly, district courts should liberally grant leave to amend when "the underlying facts or circumstances relied upon by a plaintiff may be a proper subject of relief." Foman v. Davis, 371 U.S. 178, 182, 83 S. Ct. 227, 230, 9 L. Ed. 2d 222 (1962). Nevertheless, a motion for leave to amend may appropriately be denied "(1) where there has been undue delay, bad faith, dilatory motive, or repeated failure to cure deficiencies by amendments previously allowed; (2) where allowing amendment would cause undue prejudice to the opposing party; or (3) where amendment

---

on the merits of the underlying claims. See Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp., 549 U.S. 422, 431, 127 S. Ct. 1184, 1192, 167 L. Ed. 2d 15 (2007) ("[A] federal court has leeway 'to choose among threshold grounds for denying audience to a case on the merits.'" (quoting Ruhrgas AG v. Marathon Oil Co, 526 U.S. 574, 584, 119 S. Ct. 1563, 1570, 143 L. Ed. 2d 760 (1999))); see also Freeman v. First Union Nat'l, 329 F.3d 1231, 1234 (11th Cir. 2003) (analyzing whether leave to amend should have been granted under Rule 15 even though the defect at issue implicated Article III standing).

50

would be futile." Bryant v. Dupree, 252 F.3d 1161, 1163 (11th Cir. 2001). "Although generally, the mere passage of time, without more, is an insufficient reason to deny leave to amend a complaint, undue delay may clearly support such a denial." Hester v. Int'l Union of Operating Eng'rs, 941 F.2d 1574, 1578–79 (11th Cir. 1991) (citations omitted).

When a party seeks to amend a complaint to change plaintiffs, Rule 17 also comes into play. See Fed. R. Civ. P. 15, Advisory Comm. Notes, 1966 Amend. Rule 17(a)(1) requires that "[a]n action must be prosecuted in the name of the real party in interest." When the real party in interest is not properly named, Rule 17(a)(3) requires the court to provide an opportunity to substitute in the correct party before the court dismisses the case, provided that the substitution is made within a reasonable time after objection. The Advisory Committee's comments make clear, though, that while the rule was added "in the interests of justice," "[t]he provision should not be misunderstood or distorted. It is intended to prevent forfeiture when determination of the proper party to sue is difficult or when an understandable mistake has been made." Fed. R. Civ. P. 17, Advisory Comm. Notes, 1966 Amend. Accordingly, "most courts have interpreted . . . Rule 17(a) as being applicable only when the plaintiff brought the action [in the name of the wrong party] as a result of an understandable mistake, because the determination of the correct party to bring the action is difficult." Wieburg v. GTE Sw. Inc., 272

51

F.3d 302, 308 (5th Cir. 2001) (citing cases); see also Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure, § 1555, at 571 (3d ed. 2010) ("[I]t has been held that when the determination of the right party to bring the action was not difficult and when no excusable mistake had been made, then Rule 17(a)(3) is not applicable and the action should be dismissed." (citing cases)).[31]

## B.

We review the District Court's application of the Federal Rules to deny amendment and substitution for abuse of discretion. Bryant, 252 F.3d at 1163; Delta Coal Program v. Libman, 743 F.2d 852, 857 (11th Cir. 1984). To the extent that the court's denial of a motion for leave to amend or substitute a party is based on factual findings, we review those findings for clear error. Powers v. Graff, 148

---

[31] The Tenth Circuit requires only that a mistake in naming the wrong party have been an honest one. Esposito v. United States, 368 F.3d 1271, 1276–77 (10th Cir. 2004). In allowing substitution under Rule 17(a)(3) when an honest but unreasonable mistake has been made, the Tenth Circuit emphasized "the policy behind Rule 17(a), which disfavors forfeiture." Id. at 1277. Nevertheless, the court left open "the possibility that a party's mistake in naming the plaintiff . . . could be so inexplicable and irrational as to raise an inference that it was not an 'honest' mistake." Id. at 1276–77; see also id. at 1275 ("Read literally, Rule 17(a) would appear to require that a party always be given a reasonable time to substitute the real party in interest where objection has been made. Such a literal reading, however would countenance conduct in violation of the spirit of the Rules . . . ." (footnote omitted)).

Plaintiffs' counsel do not urge us to adopt the Tenth Circuit's standard; they concede that Rule 17(a)(3) is only available "(1) when an understandable mistake has been made in the determination of the proper party or where the determination is difficult; (2) where the change is merely formal and does not materially alter the known facts or issues; and (3) where the original plaintiff was not a fictitious entity; (4) if done timely." Appellant Br. in 13-10839, at 27 (quoting Delta Coal Program v. Libman, 554 F. Supp. 684, 690 (N.D. Ga. 1982), aff'd 743 F.2d 852 (11th Cir. 1984)). Accordingly, we apply that standard in evaluating their request to amend and substitute.

52

F.3d 1223, 1226 (11th Cir. 1998).  While the court's application of Rule 17 and 15 are obviously interrelated—we analyze each rule separately, beginning with Rule 17.

1.

In their briefs to this court, plaintiffs' counsel never tackle head-on the District Court's conclusion that Rule 17(a)(3) was unavailable to them because of the way in which these 588 cases were filed—that is, seemingly without investigation or authorization.  They acknowledge that Rule 17(a)(3) is only available "when an understandable mistake has been made in the determination of the proper party or where the determination is difficult," Appellant Br. in 13-10839, at 27–28 (quotation marks omitted), yet they never explain why Mr. Wilner's 588 mistakes were understandable—other than by suggesting, as a general proposition, that the size of the tobacco litigation and Engle III's tight deadline should excuse the many "technical pleading errors."

In this respect, plaintiffs' counsel's arguments to this court were constrained by counsel's failure in the District Court to lay the factual foundation for their substitution request.  Common sense dictates that a lawyer who files over 500 defective pleadings and who later seeks the court's leave to fix his mistakes must establish that he is entitled to it.  See generally Fed. R. Civ. P. 7(b) (requiring any motion to "state the relief sought" and "state with particularity the grounds for

53

seeking the order"). There is no doubt that plaintiffs' counsel had the singular ability to demonstrate to the District Court why Mr. Wilner's filing of all these invalid cases was understandable under the circumstances. And yet, as the District Court observed in its January 2013 order, they left critical questions unanswered. See Doc. 925, at 10 ("[W]hether counsel undertook any significant effort during [the Engle III savings period] to confirm the status of their clients remains unestablished in the record.").

We recount what "evidence" plaintiffs' counsel did submit and then explain why we agree with the District Court that Rule 17(a)(3) was not available on this record.

First, plaintiffs' counsel submitted Mr. Wilner's sworn declaration in response to the defendants' motion to dismiss the first 521 personal injury cases. The declaration described The Wilner Firm's pre-filing attempts to contact its clients and investigate their claims in exceptionally broad terms. We are told that the firm collected 3,000 clients by 1998 and "remained in contact with most but not all" during the pendency of the Engle class action. Doc. 589-1, at 2. "Unfortunately, some [clients] had been lost to follow up," and thus, "the status of the original claimant was unknown" when Engle III's savings period came to a close. Id. Faced with a deadline, Mr. Wilner "elected to list all claimants of

54

unknown status under the name of the injured or deceased party, who had first contacted me or my firm." Id.

That's it. We are not told what The Wilner Firm did to keep up with its clients during the decade or so that Engle was winding through state court, how many of those clients it lost touch with before Engle III came down in December 2006, what efforts it took following Engle III to reestablish contact, or how many of these missing clients it failed to contact before a lawsuit was filed on their behalf in January 2008. Nor are we told what information Mr. Wilner used to draft complaints for the missing clients, when those clients had last been in contact with the firm, or what efforts were taken to update client information and otherwise investigate the validity of their cases. And Mr. Wilner's declaration did not even mention, much less explain, how his firm came to file personal injury cases on behalf of smokers who died before the mid-'90s—who obviously did not contact his firm to request representation.

These missing details were highly relevant to plaintiffs' counsel's request for leave to amend; as the party seeking to substitute in new plaintiffs in 588 cases, the onus was on plaintiffs' counsel to show the court why they couldn't have discovered that their clients were dead before they filed cases in their names. Counsel had more than one opportunity to build a record on this point. During the June 2012 hearing, the court peppered the plaintiffs' attorneys with questions,

55

trying to understand how in the world they could claim to have had authority to file these lawsuits or to have investigated the facts stated in all these complaints. Mr. Wilner was not present at that hearing, leaving his co-counsel to answer for his actions. Ms. Cabraser, who joined the litigation in 2011, claimed ignorance to all things related to the original filing and, when pressed on the details of Mr. Wilner's incomplete declaration, simply stood on its contents without elaborating or offering to submit additional support. See, e.g., Doc. 677, at 42, 62, 64, 65–67, 72–73.

In fact, it appears that Ms. Cabraser thought it was the court's job to build a record explaining the filing of all these complaints:

> We would ask the Court, if it has a concern on any of these factual issues [regarding how and why the cases were filed], to use an order to show cause procedure with respect to authority to file because the federal rules say that there should be an opportunity to amend to allege the party with the right capacity to pursue the particular claim.
>
> Given the fact that we have information from these claimants themselves [(i.e., the survivors of the predeceased plaintiffs)] now through the questionnaires . . . , we believe the fairest thing to do rather than to speculate, particularly when someone [(Mr. Wilner)] isn't here, is to enable us to act on the information that we have going forward on these claims and to proceed with those claims that can proceed.

Id. at 73. Following the hearing, plaintiffs' counsel did not submit any documentation to support the portions of Mr. Wilner's declaration the court found untenable, they didn't submit any more information—in any form—to address the

56

court's unanswered questions, and they didn't seek an evidentiary hearing on the matter to submit evidence and testimony and allow the court to make factual findings.

It was only months later, after the defendants moved for a Rule 11 inquiry, that Mr. Wilner came forward with a few more details. Plaintiffs' counsel rely on the information contained in their Rule 11 filings in urging us to overturn the District Court's dismissal of the predeceased plaintiffs' cases, despite the fact that neither side asked the District Court to consider the Rule 11 filings in evaluating the defendants' motion to dismiss. Even if we do consider Mr. Wilner's Verified Response to the Rule 11 motion and the summary data attached thereto, the record remains incomplete or conflicting on nearly every relevant point.

First, Mr. Wilner's sworn declaration states, "By 1998, I represented over 3,000 Florida smokers or their families. These clients were signed into contractual agreements giving the firm latitude as to the appropriate method to preserve and advance their claim[s] against the cigarette companies." Doc. 589-1, at 1 (emphasis added). His Verified Response states, though, that his representation began when his firm received "information sufficient for us to believe that such client wanted us to act on their behalf should circumstances deem it advisable." Doc. 822, at 4. It explains further: "requiring clients, who were at the time Engle class members and formally represented by class counsel, to sign agreements in the

57

mid 1990s was <u>not</u> consistent with class action practices nor with our intent to monitor their potential claims and act only if necessary." <u>Id.</u> at 18. "[R]egardless of the presence of a written agreement, our firm was duty bound to presume it represented each client who made contact seeking legal advice, and to act accordingly." <u>Id.</u> So while Mr. Wilner originally told the court he had signed agreements from all 3,000-or-so of his "clients," if the Verified Response is to be believed, it would seem that he considered anyone who contacted his firm to be a client and that none of them executed a written representation agreement.

Next, in his sworn declaration, Mr. Wilner stated, "my firm had successfully remained in contact with most but not all of these clients during the decade long period between their initial contact with the firm and the Supreme Court's [<u>Engle III</u>] decision." Doc. 589-1, at 2. In his Verified Response, Mr. Wilner tells us the opposite: that "[t]here is normally no need to monitor individual class members," and that the Florida Supreme Court's decertification of the class imposed "a unique and exigent circumstance" on his firm "whose last contacts with these class members could well be decades old." Doc. 822, at 4–5. The summary data he attached to his Verified Response confirms that his last contact with most of the predeceased plaintiffs was in the mid- to late-'90s. We are not given data for the rest of Mr. Wilner's "clients." In light of Mr. Wilner's confessed belief that he was "duty bound to presume [he] represented each client who made contact," <u>id.</u> at

58

18, we are left with the inevitable conclusion that he filed lawsuits in 2008 for many individuals whose last, and perhaps only, contact with his firm was nearly a decade earlier, who never authorized him to file suit, and who, in all likelihood, had no earthly idea that Mr. Wilner considered himself to be their lawyer.

Finally, while the Verified Response at least gives some information regarding Mr. Wilner's efforts to reestablish contact during the Engle savings period (his sworn declaration was silent on this point), it omits the details necessary to make it useful.  His Verified Response says the firm tried "mailing, calling, visits to last addresses, talking to neighbors, [and] other methods," to contact its clients during the savings period.  Doc. 822, at 5–6.  That's all.  Mr. Wilner doesn't disclose how many clients his firm tried to contact or how many were successfully contacted (we know it didn't contact at least 588), much less when the firm started trying, how many people were assigned to the task, how many letters, phone calls, or house calls they made, whether the firm made any other attempts to confirm that its clients were still alive (for example, through a public records search), or any of the other relevant information that would have enabled the District Court to evaluate whether Mr. Wilner made a reasonable effort to track down and verify the status of the individuals he filed suit on behalf of.[32]

---

[32] To give a relevant point of comparison, when plaintiffs' counsel sought an extension of the questionnaire deadline, they devoted four full pages to describing in great detail the efforts

59

And as an "explanation" for filing personal injury suits for 100 smokers whom he presumably knew to be dead (because his files indicated contact with these "clients" after the plaintiff-smoker's date of death), Mr. Wilner simply chalks it up to "reasons that can never be determined." Doc. 822, at 14.

On this record, plaintiffs' counsel would have us overturn the District Court's refusal to allow the substitution of plaintiffs under Rule 17(a)(3). However, they never cogently explain where the District Court went wrong in concluding that Rule 17(a)(3) was unavailable in these cases because of their failure to establish that Mr. Wilner's 588 "mistakes" were understandable. Instead, they direct our attention to various recitations of the rule's policy underpinnings to support the general point that Rule 17(a)(3) was promulgated to avoid forfeiture of otherwise valid claims. From that they insinuate that the District Court must have erred because plaintiffs' counsel have now identified the real plaintiffs in these cases, and those plaintiffs are now willing and able to proceed.

But as the Advisory Committee and courts applying the rule have made clear, Rule 17(a)(3) isn't a plenary license to fix "pleadings errors" in all cases for all reasons. Rather, the rule "is intended to prevent forfeiture when determination of the proper party to sue is difficult or when an understandable mistake has been

they were taking to contact their clients and gather the information the court required. See Doc. 359.

60

made."  Fed. R. Civ. P. 17, Advisory Comm. Notes, 1966 Amend.  In fact, as an example of the type of conduct that isn't covered by the rules, the Advisory Committee offers an example that resembles Mr. Wilner's en masse filing:

> [Rule 17(a)(3)] does not mean, for example, that, following an airplane crash in which all aboard were killed, an action may be filed in the name of John Doe (a fictitious person), as personal representative of Richard Roe (another fictitious person), in the hope that at a later time the attorney filing the action may substitute the real name of the real personal representative of a real victim, and have the benefit of suspension of the limitation period. It does not even mean, when an action is filed by the personal representative of John Smith, of Buffalo, in the good faith belief that he was aboard the flight, that upon discovery that Smith is alive and well, having missed the fatal flight, the representative of James Brown, of San Francisco, an actual victim, can be substituted to take advantage of the suspension of the limitation period.

Id. (quoted by the District Court's January 2013 order, Doc. 925, at 9–10).

Plaintiffs' counsel dismiss the Advisory Committee's hypothetical as "imperfect" and "inapt" because Mr. Wilner didn't file suit on behalf of fictitious people—he had names.  Appellant Br. in 13-10839, at 32.  They fail to grapple with the broader point: that Rule 17 was not promulgated to allow lawyers to file placeholder actions (Mr. Wilner called them "protective filings") to keep a limitations period open while they investigate their claims and track down the proper parties.  If we were to adopt the approach plaintiffs' counsel propose—and thus compel courts to allow substitution any time the real plaintiff is waiting in the wings—we would read this limitation out of existence and enable, in fact

61

encourage, lawyers to file complaints without proper authorization or investigation. Such a result would run counter not only to the policy underpinnings of Rule 17, but also those of Rule 11,[33] and would, in a very real sense, obstruct the district courts' ability to administer justice to litigants waiting for their cases to be heard.

Plaintiffs' counsel also complain that the District Court failed to account for "the actual circumstances presented by the Engle litigation itself." Appellant Br. in 13-10839, at 32. We take that to mean that plaintiffs' counsel seeks relief from what they see as an overly rigid application of the Federal Rules in light of the unique challenge presented by the volume of plaintiffs and a relatively short filing window. Clearly The Wilner Firm faced a significant logistical challenge in trying to track down several thousand individuals during the Engle III savings period, but this challenge was at least partially a problem of its own making. Plaintiffs' counsel have consistently submitted that Engle III triggered an until-then-

---

[33] Rule 11(b) provides, in relevant part:

By presenting to the court a pleading, written motion, or other paper—whether by signing, filing, submitting, or later advocating it—an attorney . . . certifies that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances:

(1) it is not being presented for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation;

(2) the claims, defenses, and other legal contentions are warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law;

(3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery . . . .

Fed. R. Civ. P. Rule 11(b).

unforeseen need to track down all their clients within its one year savings period. But it was contemplated as far back as the Dade County Circuit Court's three-phase trial plan that certain elements of each class member's case would have to be tried separately. Presumably that's the whole reason Mr. Wilner signed up so many clients in the 1990s. Thus, we cannot blindly accept plaintiffs' counsel's suppositions that "[t]he Engle proceedings gave no hint, until the final decision by the Florida Supreme Court, that individual damage claims would be authorized," Doc. 589-1, at 2, or that there was "no need to monitor individual class members" until Engle III came down, Doc. 822, at 4.

Even if Engle III had created an unforeseen hardship, such exigencies did not excuse Mr. Wilner from his Rule 11 obligations at the time of filing, nor do they give plaintiffs' counsel an automatic right to substitution now. As the District Court put it during one of the many hearings required to sort through the problems with Mr. Wilner's bulk filing, "the volume of claims does not render the fundamental precepts of lawyer-client responsibilities, vis-a-vis the client and vis-a-vis the Court as procedural niceties." Doc. 677, at 40. The solution to managing these types of mass actions is surely not that the standard of care diminishes as the number of cases grows. If we were to hold that plaintiffs' counsel are entitled to substitution solely on account of the large volume of cases they filed, we would invite the same result in every mass tort action. In fact, we would give lawyers an

63

incentive to tack on unauthorized and uninvestigated claims; for if sheer volume relaxes the requirement that a lawyer investigate the facts alleged in his complaints before filing them, then bulk filing like Mr. Wilner's becomes self-justifying—a practice we would never accept in a single case would become more palatable the more times it is repeated. We decline to adopt such an approach. If Mr. Wilner lacked the resources required to fulfil his obligations to his clients and the court, he should have enlisted the services of another firm during the Engle savings period (as he did in 2011) or he should have pared down the volume of claims to something that he could manage.

For the foregoing reasons, we agree with the District Court's conclusion that plaintiffs' counsel were not entitled to the substitution of plaintiffs under Rule 17(a)(3). We next address Rule 15.

## 2.

In addition to the way they filed these cases, plaintiffs' counsel compounded their troubles by failing for over four years to bring their 588 mistakes to the District Court's attention. It was only after the court-ordered questionnaire process revealed all these non-viable cases that plaintiffs' counsel sought leave to amend their defective complaints to fix their mistakes. Not surprisingly, the District Court concluded that the request came far too late—even if the court would have allowed amendment and substitution if counsel had brought these problems to its attention

64

shortly after filing, counsel "slept on whatever rights they may have had to amend their complaints and file in the name of the proper parties" by waiting to do so until the court uncovered the problems four years later.  Doc. 925, at 12.

In urging us to overturn that decision as an abuse of discretion, plaintiffs' counsel argue that they "sought leave to amend the erroneously styled complaints at a reasonable time in the context of this unusual, protracted mass tort litigation," Reply Br. in 13-12901, at 1; that "[n]o grounds existed to find that Plaintiffs engaged in undue delay, bad faith or dilatory motive, in light of the clear record indicated by the protracted Engle litigation, including the multiple stays ordered by the District Court with respect to the Engle progeny cases," Appellant Br. in 13-10839, at 48–49; and that "[a]ny delay that has occurred is not the result of Plaintiffs who have slumbered, but, instead, is the product of discretionary case management in this mass tort litigation, including the District Court's decision to impose a stay on the individual lawsuits," id. at 22.  Moreover, because no pre-trial work had been done on account of the court's stay order, plaintiffs' counsel assert that the defendants would not be prejudiced by allowing them to convert these personal injury claims into wrongful death and/or survival claims.

We focus first on the stay order, which is the only real explanation plaintiffs' counsel offer for their four-year silence.[34]  As described earlier, the District Court entered an order staying all Engle progeny cases in October 2008, pending resolution of the parties' petitions for interlocutory appeals from two of the court's orders.  After this court denied one petition and granted the other and decided the appeal, the District Court left its stay order in place at both sides' request.  In their joint motion requesting that the court leave the stay in place, the parties explained, "retention of the stay will facilitate the orderly management of this litigation, and will promote judicial economy and the convenience of the Court and the parties." Doc. 5, at 1.  Plaintiffs' counsel now say the stay order deprived them of any opportunity to fix their mistakes in the 588 predeceased plaintiffs' cases.  They rely heavily on a 2009 order severing the original multi-plaintiff cases into 4,432 separately-docketed cases, in which the court wrote: "The stay in these cases remains in effect until further order of this Court.  Upon the lifting of the stay, the Court will enter orders requiring the filing of an amended complaint and answer in each case." Doc. 1, at 4.  From that language, they infer that they were unable, or

---

[34] We assume that Mr. Wilner's representations in his sworn declaration and his Verified Response are truthful, and that he knew, before the questionnaire process, that "most but not all" of the predeceased plaintiffs' complaints were "mis-styled." See Doc. 822, at 9; see also Doc. 589-1, at 2 ("[F]ollowing the filing, efforts to locate survivors were successful in all but a few cases, and those survivors ratified the filings nunc pro tunc.").  For the undisclosed number of complaints that counsel didn't know to be "mis-styled," the only conclusion we can draw is that plaintiffs' counsel discovered the defects upon receiving a completed questionnaire from the predeceased plaintiffs' survivors.

at least had no obligation, to correct the pleadings in the 588 predeceased plaintiffs' cases.

The District Court saw things differently; in its January 2013 order it wrote, "the stay did not prevent counsel from inquiring into the status of their clients and bringing any changes in status to the Court's attention." Doc. 925, at 11. In fact, plaintiffs' counsel themselves did not interpret the stay order as an absolute bar: when a living personal injury plaintiff died, they filed a motion asking the court to lift the stay for the purpose of allowing them to amend the complaint to allege wrongful death or survival claims and substitute in the personal representative of that deceased plaintiff. See id. (listing examples); see also Doc. 1128 (granting 90 such motions). Plaintiffs' counsel have given no explanation as to why they couldn't have done the same in the predeceased plaintiffs' cases.[35]

---

[35] Plaintiffs' counsel say they started filing motions for leave to amend in post-filing-deceased plaintiffs' cases in response to the Florida District Court of Appeal, Second District's decision in Capone v. Philip Morris USA, Inc. ("Capone I"), 56 So. 3d 34 (Fla. 2d Dist. Ct. App. 2010). See Reply Br. in 13-12901, at 11–12. In Capone I, the court explained that "a personal injury claim is extinguished upon the death of the plaintiff, and any surviving claim must be brought as a new and separate wrongful death action—it cannot be brought as an amendment to a personal injury action." Id. at 36. The court then upheld the dismissal of a personal injury claim in which the plaintiff died after filing because the survivors did not file a new wrongful death suit within two years of the plaintiff-decedent's death (they had instead just moved to amend the original personal injury claims). Id. Capone I was reversed by the Florida Supreme Court in June 2013. Capone v. Philip Morris USA, Inc. ("Capone II"), 116 So. 3d 363, 377 ("[I]t is clearly in the furtherance of justice to allow the reasonable amendment of pleadings to add a claim for wrongful death, and possibly a claim for survival damages, when the injured plaintiff in a personal injury action dies." (quotation marks omitted)). However, Capone II was decided after the relevant events leading to these appeals.

Following Capone I, which came down in December 2010, the Special Master noted in his April 2011 report to the District Court that the District Court of Appeal's interpretation of

Nor do they explain why they remained silent in the face of the District Court's repeated requests for the parties' assistance in culling and categorizing the docket. As already explained in detail, the District Court sought from the outset to shape the mass of undifferentiated cases into something more defined and manageable—something that could be quantified and categorized and therefore more efficiently pushed towards resolution. In fact, plaintiffs' counsel proposed various ways to economize and classify the cases, including giving priority to

_____

Florida law could invalidate a large number of cases in which "the smoker has died of smoking related illness but did not file a wrongful death action before the expiration of the [Engle III] savings period." Doc. 147, at 53. In the June 2011 hearing (the same hearing in which the court decided that questionnaires were needed), the court asked Mr. Wilner how many cases were going to require amendment and/or new wrongful death claims to be filed:

> [THE COURT:] Are we talking three or 300, or do you know?
>
> MR. WILNER: I think there will be some . . . .
>
> [THE COURT:] Do you know how many there are?
>
> MR. WILNER: I don't, your Honor. I can get that count back to the Court pretty soon, but I don't have it on the tip of my tongue.

Doc. 171, at 90. Mr. Wilner did not follow up with the information. It was only after the questionnaire process concluded that the court learned the number of plaintiffs who died after filing—and that 588 had died before filing.

During this same period, plaintiffs' counsel started filing new wrongful death cases for the survivors of personal injury plaintiffs who died after filing; "in an abundance of caution," they also filed motions to amend and substitute in the original personal injury actions—seeking to convert those into wrongful death cases. See, e.g., M.D. Fla. no. 3:09-cv-13057, Doc. 3 (May 23, 2011). Thus, it is obvious that they understood the stay not to be an absolute bar to filing a motion to amend. Rather, it seems that when they had something to gain from seeking leave to amend and substitute (in cases with post-filing deaths, they ensured that the survivors' wrongful death/survival claims were preserved, regardless of what became of Capone I), they were more than capable of filing such motions. The only reason we can divine—for we are given no reason by plaintiffs' counsel—for their failure to do the same in cases with pre-filing deaths is that a request for leave to amend and substitute in those cases would have only revealed that the cases were due to be dismissed under the reasoning of Capone I (since, by 2011, a new wrongful death case would have come more than two years after the decedent's death).

68

living smokers and consolidating cases or certifying smaller class actions based on shared characteristics (for example, disease type, date of diagnosis, cigarette brand, etc.). Obviously the effectiveness of such efforts depended on the court having accurate information regarding the type of case, the current status of the plaintiff, and the facts that gave rise to their claims.[36] And yet plaintiffs' counsel opposed the defendants' initial request that they submit basic information about their cases, including whether the named plaintiff was still alive. They opposed the Special Master's questionnaires seeking the same type of information—claiming that they were in the process of gathering the information and could provide it "soon." And they represented to the court that they had had recent contact with each plaintiff and would be willing to certify the accuracy of every single complaint under Rule 11.

And yet in 2012, when the questionnaires came in showing 588 supposedly living plaintiffs to be dead, plaintiffs' counsel's only explanation: "there has not been an opportunity [since the proceedings were stayed in 2008] to revamp the pleadings." Doc. 677, at 58 (June 2012 Status Conference). The District Court didn't think much of that explanation:

> I don't know if I can buy that. You know, I understand—you can see the frustration here today, and I think it's finally kind of caught

---

[36] Even if the need for accurate data on the claims wasn't obvious, the court and the Special Master made it explicit on more than one occasion, as recounted earlier. See, e.g., Doc. 147, at 14; Doc. 717, at 14, 17, 37.

up to us because we spent the better part of a number of years now trying to get a hold of these cases and trying our level best to figure out how in the world are we going to do justice to both sides in this case.

The notion that lawsuits were filed on behalf of people who were dead, and in some cases dead for a long time—I think you can correct me—but I think one of the plaintiffs had been dead for 25 years, and the notion that those lawsuits could be filed and then because so many lawsuits were filed, we, as an accommodation and as a case management tool, stayed those cases so we could try to start to get a hold of them and that now becomes the reason that the plaintiffs were freed of any obligation, if that obligation did not exist before the date of filing, but were now freed of all obligation or any obligation to determine whether their client was a living, breathing human being or not.

Really?

Id. at 58–59.  We embrace the District Court's view on this point.  In light of the

constant efforts by the court to get a handle on the tobacco cases and its repeated

request for more help from the parties, we wholly reject plaintiffs' counsel's blind

reliance on the court's stay order as an excuse for four years of silence on

something as basic as whether the named plaintiffs in over 500 cases were alive.

Plaintiffs' counsel also rely on the stay order to support a different version of

the same argument—that any delay that occurred was not "undue"—because the

parties hadn't begun pretrial preparations, and so the defendants would not be

prejudiced by allowing them to amend these complaints.  In fact, plaintiffs'

counsel say, rather than "accelerat[ing] the resolution of such cases or improv[ing]

the efficient management of the litigation," any earlier attempt to remedy their

70

mistakes in these 588 cases "would likely have created piecemeal administrative work for the District Court and required still more amendments of the pleadings once the cases were activated for trial" (because personal representatives could later "change their minds about whether to carry the litigation forward"). Reply Br. in 13-12901, at 13. In other words, they argue that the four-year delay was at worst harmless and at best in the interest of efficiency.

First, to the extent that plaintiffs' counsel suggest that they did the District Court a favor by keeping secret the fact that 588 complaints needed amending, we reject that argument and the premise underlying it outright. Plaintiffs' counsel's argument implies that they were free to undermine the District Court's efforts to gather accurate information about the Engle cases simply because they felt the court's and the parties' resources were better spent elsewhere. It is not plaintiffs' counsel's place to decide what's best for the litigation. As officers of the court, they were duty bound to inform the court of the information in counsel's complaints that they knew to be false—even if the court hadn't repeatedly asked them for that information. See Attwood v. Singletary, 105 F.3d 610, 613 (11th Cir. 1997) ("Rule 11 requires [an attorney] to make reasonable inquiries into the veracity of information filed before the court and to advise the court of any changes."); Turner v. Sungard Bus. Sys., Inc., 91 F.3d 1418, 1422 (11th Cir. 1996) ("[A] litigant's obligations with respect to the contents of [his pleadings] are not

71

measured solely as of the time they are filed with or submitted to the court, but include reaffirming to the court and advocating positions contained in those pleadings and motions after learning that they cease to have any merit." (quoting Fed. R. Civ. P. 11, Advisory Comm. Notes, 1993 Amends.)).

Second, even if we accept that the defendants would not be prejudiced because these 588 cases laid dormant on account of the stay, that does not automatically excuse plaintiffs' counsel's four-year delay. It is true that in evaluating the tardiness of a motion to amend, courts typically focus on the prejudice that would result if the motion were granted. See, e.g., Bryant, 252 F.3d at 1165 ("Because there is no evidence that allowing an amendment at this stage would prejudice the defendants, the district court should have allowed the plaintiffs to amend their complaint."); see also Floyd v. E. Airlines, Inc., 872 F.2d 1462, 1490 (11th Cir. 1989) ("The mere passage of time, without anything more, is an insufficient reason to deny leave to amend."), rev'd on other grounds, 499 U.S. 530, 111 S. Ct. 1489, 113 L. Ed. 2d 569 (1991). However, prejudice to the non-moving party is not the only factor courts consider; the reasons for the delay are also relevant. Accordingly, a district court has discretion to deny leave to amend when the moving party's delay was the result of bad faith, dilatory tactics, or sheer inadvertence, or when the moving party offers no adequate explanation for a

72

lengthy delay.[37]  See Carruthers v. BSA Adver., Inc., 357 F.3d 1213, 1218 (11th

Cir. 2004) (affirming the denial of leave to amend where the moving party offered

no explanation for why she could not have included the proposed amended

pleadings in her original complaint or her first amended complaint); Campbell v.

Emory Clinic, 166 F.3d 1157, 1162 (11th Cir. 1999) (affirming denial where "[t]he

facts upon which the claims . . . were based were available at the time the

complaints were filed"); Hester, 941 F.2d at 1579 ("Given the long history of this

case, and the opportunities for [the plaintiff] to attempt to cure the deficiencies in

the complaint, [the plaintiff's] proposed amendment was clearly untimely . . . .");

see also Quaker State Oil Refining Corp. v. Garrity Oil Co., 884 F.2d 1510, 1517

(1st Cir. 1989) ("[P]arties seeking the benefit of the rule's liberality have an

obligation to exercise due diligence . . . .").

This isn't a case in which the information needed to amend the complaints

has only recently come to light.  The information plaintiffs' counsel needed to file

an accurate complaint has been available since before these cases were filed.  Even

---

[37] Plaintiffs' counsel suggest that it was the defendants' burden to show why their request for leave to amend shouldn't have been granted.  That is wrong.  The party seeking leave to amend under Rule 15 bears the burden of establishing his entitlement to it—particularly where there has been such a long and seemingly unjustified delay.  See Wright et al, § 1485, at 687–88 ("A motion to amend under Rule 15(a), as is true of motions generally, is subject to the requirements of Rule 7(b), and must set forth with particularity the relief or order requested and the grounds supporting the application."); see also Cresswell v. Sullivan & Cromwell, 922 F.2d 60, 72 (2d Cir. 1990) ("The burden is on the party who wishes to amend to provide a satisfactory explanation for the delay."); Chitimacha Tribe v. Harry L. Laws Co., 690 F.2d 1157, 1163 (5th Cir. 1982) ("When there has been an apparent lack of diligence, the burden shifts to the movant to prove that the delay was due to excusable neglect.").

if we were to excuse counsel's failure to discover that information before they filed these complaints, and even if we were to accept that they were diligent in tracking down survivors of all the predeceased plaintiffs after these cases were filed, they have no excuse for withholding that information from the court. It's clear that if the court hadn't ordered plaintiffs' counsel to submit the questionnaires, plaintiffs' counsel would have continued to sit on that information for years until the court activated these cases for trial. See Doc. 822, at 9 (Mr. Wilner's Verified Response) ("[W]e anticipated amended complaints would be filed upon the lifting of the stays."). As the District Court explained to plaintiffs' counsel, it's not the court's job to uncover the parties' mistakes—"that's why Rule 11 exists. That's why it's there. It's not the Court's responsibility to engage in this winnowing process." Doc. 677, at 63. But to say that, having unearthed plaintiffs' counsel's mistakes, the court was then required to grant them leave to fix those mistakes under Rule 15(a)'s command that it do so "when justice so requires," is, to put it bluntly, absurd.

Thus, we affirm the District Court's conclusion that the years of unjustified delay and obfuscation stripped plaintiffs' counsel of whatever rights to amendment that they might have had if they had brought the defects to the court's attention in a timely fashion.

74

C.

As noted above, in their opening brief in appeal no. 13-10839, plaintiffs' counsel also ask for a "limited remand" to reinstate three cases in which they say the named plaintiff-smoker was in fact alive at the time of filing. In their reply brief in that same appeal, they identified four more such cases. They have offered no explanation as to how they discovered that these plaintiffs were actually alive at the time of filing or why they couldn't have discovered that fact earlier. They claim to currently be "engaged in an ongoing intensive verification process as to who was alive at the date of filing," and they apparently intend to seek a "limited remand" for any more such cases that they discover. Appellant Br. in 13-10839, at 17 n.11.

We decline to grant what is effectively a request to reopen the questionnaire process to correct errors that plaintiffs' counsel have only now discovered. They have had ample opportunity to check their clients' dates of death. They had over four years before the questionnaire process to discover and confirm the status of the plaintiffs named in their lawsuits. The court gave them five months' notice that they had to submit questionnaires including a date of death for each plaintiff. The court granted two extensions to submit late questionnaires and to fix mistakes in those already submitted. And the list of cases to be dismissed, which was

75

compiled by the Special Master, was available to the parties nearly a year before the court dismissed the first 521 predeceased plaintiffs' cases in January 2013.

Accordingly, the dismissal of the seven cases identified by plaintiffs' counsel are affirmed. Plaintiffs' counsel may not continue to submit incorrect information to the District Court and expect to be granted leave to fix their mistakes every time a new one is uncovered.

## IV.

We now turn to the loss of consortium cases that derived from the predeceased plaintiffs' personal injury cases. Plaintiffs' counsel do not argue that these cases should be allowed to proceed based on the consortium claims that were originally pled; rather, they assert that they should have been granted leave to amend the complaints in these cases to state claims for wrongful death and/or survival damages.[38] And yet plaintiffs' counsel only asked for leave to amend in

---

[38] The Florida Supreme Court has explained that a "claim for loss of consortium is derivative in nature and wholly dependent on [the physically injured spouse's] ability to recover." Faulkner v. Allstate Ins. Co., 367 So. 2d 214, 217 (Fla. 1979); see also Gates v. Foley, 247 So. 2d 40, 45 (Fla. 1971) ("[A wife's] right of action is a derivative right and she may recover only if her husband has a cause of action against the same defendant."). Nevertheless, there is some disagreement among the Florida intermediate courts of appeal regarding the independent viability of a standalone loss of consortium claim after the injured spouse (in these cases, the smoker) has died. Compare ACandS, Inc. v. Redd, 703 So. 2d 492, 494–95 (Fla. 3d Dist. Ct. App. 1997) ("[T]he legislature did not intend for a spouse's consortium claim to survive an injured spouse's death from his or her injuries . . . ."), with Randall v. Walt Disney World Co., 140 So. 3d 1118, 1121 (Fla. 5th Dist. Ct. App. 2014) ("[A] loss-of-consortium claim survives the death of a deceased spouse."). We need not resolve this conflict today because plaintiffs' counsel have not asserted that these plaintiffs' loss of consortium cases are independently viable as loss of consortium cases. Instead, they sought leave from the District Court to convert these plaintiffs' consortium claims into wrongful death and/or survival claims.

76

25 of the 160 consortium cases. The other 135 were dismissed by the court without comment and without objection; only now does plaintiffs' counsel attempt to question their dismissal—asking this court to grant them leave to file a Rule 60(b) motion in the District Court.

To the extent that plaintiffs' counsel suggest that the District Court's dismissal of these 135 consortium cases in its January 2013 and June 2013 orders was inadvertent or came as a surprise to them, we reject both contentions outright. The list of cases that were eventually dismissed by the court's January 2013 order was generated by the Special Master a year before the order was entered, was attached to the defendants' motion to dismiss, and was attached to the January 2013 order itself. See Docs. 503-5, 582-1; 925-1. That list clearly indicated names and docket numbers for the 521 predeceased smokers and their personal injury cases and, next to 132 of these personal injury cases, the names and docket numbers for spouses and their consortium cases. Similarly, the second list of 67 predeceased plaintiffs' cases that were eventually dismissed by the court's June 2013 order was attached to the defendants' motion to dismiss filed in February 2013 and clearly listed three docket numbers corresponding to consortium cases. See Docs. 933-1, 1101-1.

The clear inference from the parties' and the court's silence regarding the consortium cases is that nobody questioned that the fate of the consortium cases

77

was tied up with the fate of the personal injury cases they derived from—that the tail would go with the hide, so to speak.  Plaintiffs' counsel had ample opportunity to object to the inclusion of the consortium cases, and yet the first indication that they believed those cases to be independently viable, see Doc. 975, at 2, came nearly a month after the court's January 2013 order, 10 months after the close of briefing on the defendants' motion to dismiss the first 521 predeceased plaintiffs' cases, and 8 months after the court heard argument on the matter.  They cannot now claim to have been surprised by the court's "inadvertent" dismissal of these cases simply because they later thought up an argument as to why those cases shouldn't have been dismissed.  Accordingly, we decline to instruct the District Court to grant plaintiffs' counsel leave to file a Rule 60(b) motion to ask the District Court to "correct" its dismissal of the first 135 consortium cases.

As for the 25 consortium claims that plaintiffs' counsel sought to amend in April 2013 to allege wrongful death and/or survival claims, the District Court held that any amendment would be futile.  The court's reasons: the Engle class representatives did not bring loss of consortium claims, and so Engle didn't toll the limitations period for these consortium cases.  Thus, the claims were untimely when the cases were filed in 2008 and so any amendments would also be untimely (even assuming that they related back to the original complaints under Rule 15(c)).

We need not adopt the District Court's rationale to affirm its dismissal of these consortium cases because plaintiffs' counsel's requests for leave to amend were due to be denied based on the court's January 2013 order alone. By seeking to convert these consortium cases into wrongful death and/or survival cases, counsel were trying to make an end run around the court's denial of their earlier requests for leave to amend the predeceased plaintiffs' personal injury claims to do the same thing. Plaintiffs' counsel assert that these consortium cases should somehow be treated differently because (we are told) the consortium plaintiffs were alive at the time of filing and are still alive today and want to pursue wrongful death claims in their capacity as the personal representatives of the predeceased smokers' estates. But we have already rejected this same form of argument in the predeceased plaintiffs' cases. That plaintiffs' counsel eventually came up with the correct plaintiffs and the correct claims does not entitle them to go back and shore up their original complaints to fix mistakes that were the result of their own inadvertence or failure to properly investigate their "clients'" claims.

The fact of the matter is that the genesis of these invalid consortium cases is identical to that of the invalid personal injury cases they derived from. They all stem from Mr. Wilner's mass filing and they all sat on the docket for years until the court ordered plaintiffs' counsel to submit the information it had been asking for all along. Plaintiffs' counsel did not come forward with any new reasons why

the court should have allowed them to amend these consortium claims 5 years after they were filed, 15 months after the Special Master identified the first group of defective cases, 3 months after the court dismissed the personal injury cases that these consortium cases derived from, over a month after an audit of the docket revealed these cases, and only then in response to the defendants' motion to dismiss.  Thus, whatever other reasons may have justified the court's denial of leave to amend, we conclude that leave was due to be denied for the same reasons given by the District Court's January 2013 order: plaintiffs' counsel "slept on whatever rights they may have had to amend their complaints."  Doc. 925, at 12.

We accordingly affirm the District Court's dismissal of all 160 loss of consortium cases.

## V.

Lastly, we consider the two wrongful death cases filed on behalf of the survivors of smokers who died before May 5, 1992—more than two years before the Engle class was certified.  Plaintiffs' counsel accept that these wrongful death claims are barred by the two-year limitations period in Florida's wrongful death statute unless that limitations period was tolled.  Plaintiffs' counsel initially asserted that the allegations in their original complaints regarding the tobacco companies' cover-up of the health effects of smoking were sufficient to establish equitable tolling.  In its November 2012 order—the order dismissing 37 such

80

wrongful death cases, which plaintiffs' counsel did not appeal—the District Court found the allegations in the original complaints insufficient to establish such tolling.  The court denied their request to amend because plaintiffs' counsel hadn't come forward with any facts that would entitle them to equitable tolling, and even if they had, they did "not claim to have new information that they could not have alleged at the time the complaints were filed."  Doc. 835, at 18.  Thus, "any amendment would either be futile or unjustified."  Id. at 19.

After the late-submitted questionnaires revealed two more cases with a decedent who died before May 5, 1992, plaintiffs' counsel came forward with more-specific allegations that, they hoped, would entitle them to some form of equitable tolling.  But the District Court found that "[t]he specific allegations Plaintiffs now seek to add . . . do not change the Court's analysis."  Doc. 1101, at 3.

In plaintiffs' counsel's appeal from this second order, they only challenge the District Court's denial of leave to amend; they no longer argue that the original pleadings were sufficient to establish equitable tolling.  Thus, we only consider whether plaintiffs' counsel should have been granted leave to amend to add new allegations that would supposedly establish equitable tolling.

Again, we need not reach the underlying question of Florida law—whether plaintiffs' proposed amendment would have established equitable tolling—because

81

plaintiffs' counsel have never attempted to establish that they are entitled to amend their complaints under Rule 15(a). The court rejected their first request to amend, in the November 2012 order, for two reasons: (1) "Plaintiffs do not claim to have new information that they could not have alleged at the time the complaints were filed," and (2) "[t]hey have suggested no facts that could demonstrate [their entitlement to equitable tolling]." Doc. 835, at 18. Accordingly, the court concluded that "any amendment would either be futile or unjustified . . . ." Id. at 19 (emphasis added). In their subsequent request for leave to amend in the two later-discovered wrongful death cases, plaintiffs' counsel only sought to add "facts that could demonstrate [their entitlement to equitable tolling]." They did not assert (nor could they) that these new allegations were based on "new information that they could not have alleged at the time the complaints were filed." In other words, plaintiffs' counsel tried to remedy their futility problem, but they didn't attempt to explain why their belated request for leave to amend—made five years after filing and only in response to the defendants' motion to dismiss—was somehow justifiable.

Plaintiffs' counsel now assert: "the fact that Plaintiffs' counsel could have made their proposed allegations at the time the original complaints were filed is irrelevant to the analysis of futility. The timing as to when these allegations are made does not demonstrate that Plaintiffs cannot successfully allege grounds for

82

tolling on the face of their amended complaint." Appellant Br. in 13-12901, at 26. They are entirely correct. The timing of their request to amend is irrelevant to futility. It is not irrelevant, however, to whether plaintiffs' counsel should be granted leave to amend their complaints to add those new allegations—a point plaintiffs' counsel failed to grapple with in their arguments to the District Court or to this court.

Instead, plaintiffs' counsel apparently assume that Rule 15 automatically enables them to tack on new facts and legal theories to their original complaints— which were filed without even giving the decedents' date of death—after the court-ordered questionnaire filled in the missing dates and thus revealed that the cases were brought more than two years after the decedent died. As explained above, Rule 15's liberal amendment standard is not an unqualified license to fix every new defect as the court uncovers them. Plaintiffs' counsel have never explained why they couldn't have included the dates of death or their "new" pleadings regarding equitable tolling in their original complaints, nor have they sought to justify their five-year delay in seeking to add this information. Accordingly, their request for leave to amend the complaints was properly denied by the District Court.

VI.

83

For the foregoing reasons, the District Court's dismissal of each category of cases is

AFFIRMED.